FILED
United States Court of Appeals
Tenth Circuit

July 31, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

MARLA SEWELL; BROOKE
SEWELL,

    Plaintiffs - Appellants,

v.

GREAT NORTHERN INSURANCE
COMPANY, a foreign insurance
corporation; HAYS COMPANIES, a
Colorado corporation;
PROFESSIONAL LINES
INSURANCE BROKERAGE, INC., a
Colorado corporation,

    Defendants - Appellees.

No. 07-1255

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO
### (D.C. No. 06-CV-00223-WDM-CBS)

Richard A. Waltz of The Waltz Law Firm, Denver, Colorado, for Plaintiffs -
Appellants.

Francine M. Mugge (Thomas N. Alfrey of Treece, Alfrey, Musat & Bosworth,
P.C., on the brief), Denver, Colorado, for Defendants - Appellees.

Before **KELLY**, **TYMKOVICH**, Circuit Judges, and **FRIZZELL**,[*] District Judge.

**KELLY**, Circuit Judge.

The case before us turns on whether an insurance broker has the responsibility to advise an insured to procure excess uninsured/underinsured motorist ("UM/UIM") coverage in an umbrella policy in addition to coverage selected in the underlying automobile policy. In this removed diversity case, Plaintiffs-Appellants Marla Sewell and her minor daughter Brooke Sewell appeal from the district court's grant of summary judgment for Defendant-Appellee Professional Lines Insurance Brokerage, Inc. ("PLI") on their claims of breach of contract, negligent misrepresentation, breach of fiduciary duty, breach of the duties of good faith and fair dealing, and deceptive trade practices.[1] We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## Background

In August 2001, Marla Sewell contacted PLI—an insurance brokerage

---

[*] The Honorable Gregory K. Frizzell, District Judge for the United States District Court for the Northern District of Oklahoma, sitting by designation.

[1] The district court also entered summary judgment for Defendants Hays Companies and Great Northern Insurance Company and the Sewells have subsequently settled their claims underlying these judgments. Hays owns PLI and the Sewells renewed the insurance policy in dispute through Hays twice after its acquisition of PLI. Sewell v. Great N. Ins. Co., No. 06-cv-00223, 2007 WL 1456133, *2 (D. Colo. May 17, 2007). Great Northern issued the policy.

firm—to acquire insurance coverage for her family, including her husband, Christopher Sewell, and their only child, Brooke Sewell. Ms. Sewell spoke with Virginia Nied and requested quotations for a homeowner's policy, a car-insurance policy, and an umbrella policy for extra protection. Ms. Sewell did not specifically request any information pertaining to UM/UIM coverage. Nor did she understand that an umbrella policy could consist of two components, liability coverage and UM/UIM coverage. PLI then sent quotations to Ms. Sewell in September 2002 that contained a number of quotations for automobile coverage, including two different amounts of UM/UIM coverage: $300,000 or $500,000 per person per accident. Ms. Sewell eventually selected a policy with $300,000 of UM/UIM coverage—the minimum available to be eligible for umbrella coverage.

In November 2001, another PLI employee, Mary LaHeist, sent an umbrella application and policy to Ms. Sewell, including a letter from PLI stating that Ms. Sewell should review the policy before signing it and returning it. The effective date of the policy was November 27, 2001. The umbrella policy, which was completed by PLI before it was sent to Ms. Sewell, indicated that there was $1 million in liability coverage and, under the "Optional Coverages to Apply" section, there were lines for UM/UIM coverage which were left blank. In addition, the coverage summary stated that whenever covered vehicles were shown, the type of UM/UIM coverage would be indicated and when there was no UM/UIM indication, there was no coverage. Next to the vehicles listed in the

summary, "Excess Liability Only" appeared. Ms. Sewell read the materials, signed the policy, and returned it without making any changes. No one at PLI ever discussed UM/UIM coverage with her and she never asked. Ms. Sewell renewed the policy in 2002, 2003, and 2004. Ms. Sewell was the only member of her family to speak with any representative of PLI.

In late 2003, Ms. Sewell contacted Ms. LaHeist after receiving a letter from PLI indicating that her Personal Injury Protection ("PIP") coverage would be eliminated from her policy due to the fact that Colorado had eliminated its no-fault automobile liability law. Ms. LaHeist told Ms. Sewell that she believed Ms. Sewell did not have to increase any of her coverages. After Ms. Sewell asked whether her umbrella coverage would "kick in," Ms. LaHeist said yes. Aplt. App. at 571. Ms. Sewell never specifically mentioned UM/UIM coverage or requested any review of her coverage other than with respect to PIP. Id. She simply "was hoping [Ms. LaHeist] would bring up any particular needs that [she] needed met." Id.

On December 5, 2004, Mr. Sewell was hit in his automobile, as he waited for a stoplight to change, by an escaping felon during a high-speed police chase. Mr. Sewell died of his injuries. Ms. Sewell then filed a claim for excess UM/UIM benefits under the umbrella policy with Great Northern but was denied because she never purchased excess UM/UIM coverage. Ms. Sewell then filed this action on behalf of herself and her minor daughter asserting (1) breach of

contract/reformation; (2) negligent misrepresentation; (3) breach of fiduciary duty; (4) breach of the duty of good faith and fair dealing; and (5) deceptive trade practices. After a motion by PLI, the district court granted summary judgment for PLI on all claims. Sewell, 2007 WL 1456133, at *9.

The district court held there was no breach of contract because the Sewells received precisely what they requested: an umbrella policy with no excess UM/UIM coverage. Id. at *3. PLI had no "special relationship" with the Sewells requiring it to affirmatively advise or warn the Sewells concerning their coverage, the district court reasoned, and reformation of the contract would be inappropriate given Ms. Sewell's unilateral mistake in assuming she had UM/UIM coverage. Id. at *4. In addition, PLI made no negligent misrepresentations because no false information was conveyed by PLI to Ms. Sewell. Id. at *5. PLI did not breach any fiduciary duty because PLI only had an ordinary insurer-insured relationship with the Sewells, and PLI did not breach any duty of good faith and fair dealing because the Sewells have no private cause of action under Colo. Rev. Stat. § 10-3-1104 and no action under Colo. Rev. Stat. § 10-3-1113 because it only applies to insurers, not brokers like PLI. Id. at *5-*6. Finally, the district court held that the Sewells could not prove any deceptive trade practices by PLI because they had not demonstrated that any allegedly deceptive practice affected the public. Id. at *6. The district court entered its judgment on May 18, 2007. The Sewells now appeal that decision.

Discussion

"We review the entry of summary judgment de novo."  N. Natural Gas Co. v. Nash Oil & Gas, Inc., 526 F.3d 626, 629 (10th Cir. 2008).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "We view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."  N. Natural Gas, 526 F.3d at 629.

This case originated in diversity, and therefore we, just as the district court, apply the substantive law of the forum state: Colorado.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

I.    Breach of Contract/Reformation

The Sewells first argue that they are entitled to a trial on the issue of whether PLI should have advised Ms. Sewell about excess UM/UIM coverage.[2]

---

[2]  As part of their arguments on appeal, the Sewells contend that PLI is not merely an insurance "agent" but rather is an insurance "producer" under Colo. Rev. Stat. 10-4-1201(7) that procures insurance contracts on behalf of an insured party.  Aplt. Br. at 18-19.  Although the Sewells suggest that this merely illustrates that PLI entered into a special relationship with the Sewells as a matter of law, Aplt. Reply Br. at 4, we see it as an attempt to redefine the relationship. The Sewells also argue that PLI should have disclosed its relationship to Great Northern as its controlling insurer under Colo. Rev. Stat. § 10-4-1203.  Aplt. Br. at 19.  We normally do not pass on arguments not raised below, and we will not address these arguments here for that reason.  Particularly on an appeal from the grant of summary judgment, we are reluctant to entertain new arguments because they have not been considered by the trial court.  Tele-Communications, Inc. v. Comm'r of Internal Revenue, 104 F.3d 1229, 1232-33 (10th Cir. 1997).

Aplt. Br. at 17-18. They also argue that Ms. Sewell did not make a "unilateral mistake" because PLI never advised her, an unskilled, uninformed layperson, about excess UM/UIM coverage. Id. at 20-21. PLI again breached the contract, the Sewells contend, when Colorado repealed its no-fault automobile liability law and they lost coverage that Ms. LaHeist never addressed in Ms. Sewell's conversation with her. Id. at 21.

In order to prove a breach of contract, the Sewells must prove (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. W. Distrib. Co. v. Diodosio, 841 P.2d 1053, 1058 (Colo. 1992).

> Colorado follows the general rule that insurance agents have a duty
> to act with reasonable care toward their insureds, but, absent a
> special relationship between the insured and the insurer's agent, that
> agent has no affirmative duty to advise or warn his or her customer
> of provisions contained in an insurance policy. . . . Whether a special
> relationship has been formed turns on whether there is "entrustment,"
> that is, whether the agent or broker assumes additional
> responsibilities beyond those which attach to an ordinary, reasonable

The Sewells' arguments in their reply brief utilizing authorities originating outside Colorado for the proposition that a special relationship existed in this case are unpersuasive. Aplt. Reply Br. at 8-9. As we discuss infra at 6-8, Colorado courts have spoken on this issue and we decline to consider contrary decisions of other jurisdictions.

We also refuse to address the Sewells' argument, raised for the first time in their reply brief, that no special relationship needs to exist for PLI to have liability. Aplt. Reply Br. at 6; see Wheeler v. Comm'r of Internal Revenue, 521 F.3d 1289, 1291 (10th Cir. 2008) ("issues raised by an appellant for the first time on appeal in a reply brief are generally deemed waived").

agent possessing normal competencies and skills.

Kaercher v. Sater, 155 P.3d 437, 441 (Colo. App. 2006) (paragraph break omitted), cert. denied, 2007 WL 807272 (Colo. Mar. 19, 2007). "[R]eformation is generally permitted when it is found that the parties have made a mutual mistake, or that there has been a mistake by one of the parties and fraud or inequitable conduct on the part of the other." Boyles Bros. Drilling Co. v. Orion Indus., Ltd., 761 P.2d 278, 281 (Colo. App. 1988).

We agree with the district court that the Sewells presented nothing during the summary judgment proceedings to suggest that PLI had anything more than a normal insurer-insured relationship with them. See Sewell, 2007 WL at 1456133, *4. Regardless of Ms. Sewell's expectation of what PLI was to do for her or what she sought from it, there is nothing in the record to suggest that there was any "entrustment." Kaercher, 155 P.3d at 441. The representations on PLI's website to which the Sewells direct us, including the financial wherewithal of the insurer, the need to understand and analyze the insured, the importance of proper amounts of insurance for adequate risk management, and the availability of UM/UIM coverage, are really no different than an agent holding himself out as knowledgeable about insurance and attentive to the needs of individual insureds which, as a matter of Colorado law, are insufficient to create any legally meaningful level of "entrustment." Id.; see Aplt. Br. at 4-6 (citing Aplt. App. 760-770). Nothing suggests that Ms. Sewell paid more for a detailed needs

analysis or for personal risk-management services. See Kaercher, 155 P.3d at 442. In short, PLI assumed no "responsibilities beyond those which attach to an ordinary, reasonable agent possessing normal competencies and skills," id. at 441, and therefore PLI did not breach its contract with the Sewells. Ms. Sewell made a unilateral mistake in assuming she had procured excess UM/UIM coverage under the umbrella policy because PLI was under no obligation to discuss such coverage with her absent a request, and Ms. LaHeist was under no obligation to discuss excess UM/UIM coverage with her after Colorado repealed its no-fault automobile liability law without being asked.[3] See id.

II.    Negligent Misrepresentations

The Sewells next argue that Ms. LaHeist's representation to Ms. Sewell that her family would be covered after repeal of Colorado's no-fault automobile liability law was a negligent misrepresentation. Aplt. Br. at 22. They also argue that the application for coverage was "incomplete and vague and should have been explained to the Sewells by PLI." Id. at 25.

"To establish a claim for negligent misrepresentation, the plaintiff must demonstrate that the defendant supplied false information in a business

---

[3] The record suggests that Ms. LaHeist did not believe that Ms. Sewell needed excess UM/UIM coverage, Aplt. App. 844-45, but regardless, Ms. LaHeist was not required to advise Ms. Sewell about it in the absence of a special relationship. We observe, however, that there is a relationship between the cost of the premiums and the risk undertaken such that an insurance agent and the insured might plausibly determine that more UM/UIM is not necessary. See Meyer v. Norgaard, 467 N.W.2d 141, 144 (Wis. Ct. App. 1991).

transaction and failed to exercise reasonable care or competence in obtaining or communicating the information upon which the plaintiff justifiably relied." Bedard v. Martin, 100 P.3d 584, 592 (Colo. App. 2004). We agree with the district court that Ms. LaHeist made no false statements to Ms. Sewell and that therefore the Sewells cannot prove a claim of negligent misrepresentation. See Sewell, 2007 WL 1456133, at *5.

The Sewells point to nothing in the record to support their assertion that Ms. LaHeist "assured [them] that their UM/UIM coverage would cover the gap in coverage." Aplt. Br. at 22. Ms. LaHeist simply said, after being asked by Ms. Sewell whether Ms. Sewell needed to raise her UM/UIM coverage on her car policy, that Ms. Sewell did not and, after being asked whether Ms. Sewell's umbrella policy would "kick in," she said "yes." Aplt. App. at 362; see id. 844-45. At the time, it was true that Ms. Sewell's umbrella policy would "kick in" with respect to liability coverage, and Ms. Sewell never specifically asked about excess UM/UIM coverage in her conversation with Ms. LaHeist. Sewell, 2007 WL 1456133, at *5. These are not false statements, as Ms. LaHeist, absent a special relationship, was under no duty to ensure that the Sewells had any particular coverage other than what they specifically requested. See Kaercher, 155 P.3d at 441. In addition, we see no relevance in the allegation that the insurance application may have been "incomplete and vague" as there are no allegations by the Sewells that any information in the application was false. Aplt.

Br. at 25.

III.    Breach of Fiduciary Duty

Next, the Sewells contend that PLI breached a fiduciary duty it owed them. Id. They assert that PLI had a duty "to notice the omissions in the application, correct the errors or ambiguities in the Policy or otherwise advise the Sewells who were relying upon PLI for its expertise." Id.

To prove a breach of fiduciary duty, the Sewells must prove (1) that the defendant was acting as a fiduciary of the plaintiff; (2) that the defendant breached a fiduciary duty to the plaintiff; (3) that the plaintiff incurred damages; and (4) that the defendant's breach of fiduciary duty was a cause of the plaintiff's damages. Graphic Directions, Inc. v. Bush, 862 P.2d 1020, 1022 (Colo. App. 1993).

We again agree with the district court that PLI did not breach any duty it owed the Sewells. See Sewell, 2007 WL 1456133, at *5. The standard relationship the Sewells had with PLI requires no more of PLI than for it to obtain the specific coverages Ms. Sewell requested and answer any questions Ms. Sewell brought to its attention, and this is what PLI, through its employees, did. See Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc., 739 P.2d 239, 243 (Colo. 1987); see also Kaercher, 155 P.3d at 441 ("Insurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status, and it is well settled that agents have no continuing duty to advise, guide, or direct a client

- 11 -

to obtain additional coverage.").

IV.     Breach of Good Faith and Fair Dealing

The Sewells also argue that PLI breached its duty of good faith and fair dealing toward them by not protecting them or acting as an advocate for them when the Sewells made a claim for excess UM/UIM benefits and by not discussing UM/UIM coverage with them.  Aplt. Br. at 29-30.

The Sewells' argument on appeal only mentions Colo. Rev. Stat. § 10-3-1113 and not Colo. Rev. Stat. § 10-3-1104 which the district court determined does not provide a private cause of action.  Aplt. Br. at 30; see Sewell, 2007 WL 1456133, at *6.  Colo. Rev. Stat. § 10-3-1113, however, only applies to insurers and not insurance brokerage firms such as PLI.  See Aplt. App. at 2 (Amended Complaint and Jury Demand) ("At all times material, Defendant PLI Brokerage engaged in the business of selling and administering insurance policies . . . .").  The Sewells therefore cannot have a claim against PLI under Colo. Rev. Stat. § 10-3-1113.

We therefore agree with the district court that the Sewells cannot state a claim with respect to a breach of the duty of good faith and fair dealing.  See Sewell, 2007 WL 1456133, at *6.  There is no evidence that any special relationship existed between the Sewells and PLI to create any of the duties the

Sewells allege were breached.[4]

## V.     Deceptive Trade Practices

Finally, the Sewells contend that PLI violated the Colorado Consumer

Protection Act ("CCPA") under Colo. Rev. Stat. § 6-1-105(1)(e), (g) & (3) and

Colo. Rev. Stat. § 6-1-113 by "promising to protect their interests[] when . . . PLI

had no intention of doing so."  Aplt. Br. at 32.  The CCPA requires proof

> (1) that the defendant engaged in an unfair or deceptive trade
> practice; (2) that the challenged practice occurred in the course of
> defendant's business, vocation, or occupation; (3) that it significantly
> impacts the public as actual or potential consumers of the
> defendant's goods, services, or property; (4) that the plaintiff
> suffered injury in fact to a legally protected interest; and (5) that the
> challenged practice caused the plaintiff's injury.

Curragh Queensland Mining Ltd. v. Dresser Indus., Inc., 55 P.3d 235, 240 (Colo.

App. 2002) (quotation omitted).

---

[4]  Although the Sewells argue that Cary v. United of Omaha Life Ins. Co.,
68 P.3d 462 (Colo. 2003), discussed by the district court, see Sewell, 2007 WL
1456133, at *6, supports their argument because a special relationship existed
between the Sewells and PLI to permit liability, Aplt. Br. at 30-31; Aplt. Reply
Br. at 16, they do not indicate how Cary dictates that a special relationship
existed in this case or point us to any other authorities.
       In addition, the Sewells' citation to Estate of Hill v. Allstate Ins. Co., 354
F. Supp. 2d 1192, 1196-97 (D. Colo. 2004), for the proposition that "[a] broker
may be held liable for failure to procure coverage if the broker did something to
contribute to the lack of coverage," is simply incorrect, Aplt. Br. at 30.  Hill
essentially said nothing different than Kaercher, 155 P.3d at 441, discussed supra,
at 7-8, that an insurance agent has no duty to advise or warn a customer of
provisions in a policy absent a special relationship, Hill, 354 F. Supp. 2d at 1197.
The Sewells therefore have produced nothing to dissuade us from our
determination that a special relationship that could impose liability on PLI did not
exist in this case.

The only issue is whether the Sewells have alleged a practice that significantly impacts the public. Considerations for whether a challenged practice significantly impacts the public for a CCPA claim include "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc., 62 P.3d 142, 149 (Colo. 2003). "[I]f a wrong is private in nature, and does not affect the public, a claim is not actionable under the CCPA." Id. The Sewells do not direct us to any record evidence suggesting that anyone other than Ms. Sewell and her daughter (and possibly Mr. Sewell's estate) were harmed by the alleged misrepresentations. See id. They also provide no record evidence that any other individual has been affected by the alleged practice or that the alleged practice has the potential to impact the public in the future. See id. Merely "presum[ing]" that "additional clients of PLI were left with a gap in coverage after the repeal of the No-Fault Act without being advised and provided the option of excess UM/UIM coverage," as the Sewells do, is insufficient. Aplt. Br. at 33. The Sewells allege a private wrong and cannot seek relief under the CCPA. See Rhino, 62 P.3d at 149.

AFFIRMED.