**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 14, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROBERT SAIZ, individually;
BRIGHTON SANTA-FE, INC., doing
business as Brighton Depot, Inc., a
Colorado corporation,

  Plaintiffs - Appellants,

v.

CHARTER OAK FIRE INSURANCE
COMPANY, a Connecticut
corporation,

  Defendant - Appellee.

No. 07-1449
(D.C. No. 06-cv-01144-EWN-BNB)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY** and **TYMKOVICH**, Circuit Judges, and **DeGIUSTI,**[**] District
Judge.

---

  Plaintiffs-Appellants Robert Saiz and Brighton Depot, Inc. (collectively

"Brighton") appeal from the district court's grant of summary judgment in favor

of Defendant-Appellee Charter Oak Fire Insurance Company ("Charter Oak").

---

 [*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

 [**] The Honorable Timothy D. DeGiusti, District Judge, United States
District Court for the Western District of Oklahoma, sitting by designation.

Saiz v. Charter Oak Fire Ins. Co., No. 06-cv-01144-EWN-BNB, 2007 WL

2701398 (D. Colo. Sept. 12, 2007) (unpublished).  Brighton brought claims

against Charter Oak based upon breach of contract and bad faith breach of

contract, and the case was removed to federal court.  We have jurisdiction under

28 U.S.C. § 1291 and affirm.

Background

Mr. Saiz, as the sole shareholder of Brighton Depot, Inc., a Colorado

corporation, owned and operated the Brighton Depot Restaurant in Brighton,

Colorado, for approximately fourteen years, beginning in 1990.  Aplee. Br. 1;

Aplt. App. 263.[1]  Brighton purchased a business owner's insurance policy from

Charter Oak for the period of June 18, 2004, to June 18, 2005.  Aplee. Br. 1; Aplt.

App. 151.  The policy was a "Restaurant PAC" policy, and it identified the type

of business as "family style."  Aplt. App. 151.  Brighton ceased operations as a

restaurant in July 2004.  Aplt. App. 265.

After the restaurant closed, Mr. Saiz maintained an office on the premises

where he continued to conduct his business, including managing two other

restaurants located in Santa Fe, New Mexico, and seeking potential buyers for the

Brighton Depot Restaurant.  Aplt. App. 269.  In addition, Mr. Saiz continued to

---

[1] As noted, we refer to Mr. Saiz and Brighton Depot, Inc. collectively as "Brighton."

pay utilities, phone, and cable service for the premises. Aplt. Br. 4; Aplt. App. 269. He also repainted and refurbished the premises in anticipation of selling the restaurant. Aplt. App. 269. The entire building was approximately 5,000 square feet, Aplee. Br. 1, and the office used by Mr. Saiz following the closure of the restaurant was approximately 500-600 square feet. Aplt. App. 269.

On December 1, 2004, Mr. Saiz learned that the premises suffered significant water damage due to a sprinkler head malfunction. Aplt. Br. 4. Mr. Saiz notified Charter Oak of a potential claim for water damage to the premises, Aplt. Br. 4, and Charter Oak began an investigation of the claim. Aplee. Br. 2. Mr. Saiz also retained Sentry Fire and Safety to investigate the loss. Aplt. Br. 4. On December 20, 2004, Charter Oak denied coverage for the loss. Aplee. Br. 2; Aplt. Br. 5. Charter Oak based the denial on provisions of the policy precluding coverage for losses caused by freezing pipes due to lack of heating and for premises considered vacant under the policy. Aplee. Br. 2, Aplt. Br. 5; Aplt. App. 278-80. Based upon additional information provided by Mr. Saiz surrounding the loss, see Aplt. App. 281-85, Charter Oak reopened its investigation on January 21, 2005. Aplee. Br. 5. Specifically, Mr. Saiz informed Charter Oak that, although heat had been turned off upstairs where the sprinkler was located, heat remained on in the lower level of the premises. Aplt. App. 283-85. Additionally, Mr. Saiz informed Charter Oak that he continued to occupy a portion of the premises. Aplt. Br. 5.

In its subsequent investigation, Charter Oak retained Knott Laboratory, Inc., to investigate the cause of the sprinkler head failure. Knott Laboratory first concluded that the sprinkler head did not malfunction because of freezing. Aplt. App. 325. It then concluded, after extensive testing and ruling out several alternatives, that "[t]he cause of the failure of the subject sprinkler head was from deliberate tampering that required a series of actions to effect the observed damages." Aplt. App. 327. Based upon these findings, Charter Oak sent a second letter in July 2005 confirming its denial of coverage. The district court determined that the building was vacant at the time the loss occurred and that the vandalism and water damage loss limitations excluded coverage under the policy. Saiz, 2007 WL 2701398, at *5, *7. The district court also found no evidence of bad faith given the clear applicability of policy exclusions. Id. at *8-9.

Discussion

A grant of summary judgment by a trial court is reviewed de novo. Sewell v. Great N. Ins. Co., 535 F.3d 1166, 1170 (10th Cir. 2008). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court reviews the evidence in the light most favorable to the nonmoving party. Fed. Election Comm'n v. Wisc. Right to Life,

Inc., 127 S. Ct. 2652, 2697 n.12 (2007). The party seeking summary judgment must inform the district court of the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Thereafter, the non-moving party must go beyond the allegations in the complaint and come forward with significantly probative evidence that would support a verdict in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). As this is a diversity action, we apply the substantive law of the forum state, Colorado. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also Sewell, 535 F.3d at 1170.

Brighton raises four issues on appeal, all regarding the district court's interpretation of the insurance policy. Brighton initially claims that the district court erred in concluding that (1) the building was vacant for purposes of the policy, (2) the vandalism limitation applied, and (3) the sprinkler leakage limitation afforded no coverage; Brighton further argues that (4) genuine issues of material fact preclude an award of summary judgment on the bad faith breach of insurance contract claim.

I. Breach of Contract

   A. Vacancy

Brighton first argues that it is entitled to a trial on the issue of whether the building was vacant. Finding the material facts undisputed, the district court held that the building was vacant because it was not being used for customary operations on the date of the loss. Saiz, 2007 WL 2701398, at *5. The policy

provides in pertinent part:

> 5. Limitations.
>> e. We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss if the building where loss or damage occurs has been "vacant" for more than 60 consecutive days before that loss or damage occurs:
>>> (1) Vandalism;
>>> (2) Sprinkler Leakage, unless you have protected the system against freezing;
>>> (3) Building glass breakage;
>>> (4) Water Damage;
>>> (5) Theft; or
>>> (6) Attempted theft.

Aplt. App. 165. The policy defines "vacant" in pertinent part:

> 18. "Vacant" means the following:
>> . . . .
>> (2) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:
>> . . . .
>> (b) Used by the building owner to conduct customary operations.

Aplt. App. 189. Although the policy does not define "customary operations," it does define "operations."

> 9. "Operations" means your business activities occurring at the described premises . . . .

Aplt. App. 188. Brighton argues that Mr. Saiz's deposition testimony created a fact issue on whether the building was vacant. Mr. Saiz testified that he conducted business at the premises on a regular basis, including ongoing payment

of utility bills and actively seeking a purchaser for the restaurant. Aplt. Br. 14-15. Further, Brighton argues that such activities are customary operations for the restaurant corporation. We are unpersuaded.

We must interpret an insurance policy "consistently with the well settled principles of contractual interpretation." Carl's Italian Rest. v. Truck Ins. Exch., 183 P.3d 636, 639 (Colo. Ct. App. 2007) (quoting Chacon v. Am. Family Mut. Ins. Co., 788 P.2d 748, 750 (Colo. 1990)). Furthermore, we must "give terms in an insurance policy 'their plain and ordinary meanings' unless it is clear from the policy that the parties intended an alternative interpretation." Carl's Italian Rest., 183 P.3d at 639 (quoting Chacon, 788 P.2d at 750) (citing State Farm Mut. Auto. Ins. Co. v. Nissen, 851 P.2d 165, 167 (Colo. 1993)).

Because the policy does not define the term "customary" operations, we consult the dictionary and the policy context for ordinary meaning. In the second and most pertinent entry, "customary" is defined as "commonly practiced, used, or observed." Webster's Ninth New Collegiate Dictionary 318 (1991). Given the policy's definition of "operations," "customary operations" in this context would be the commonly practiced business activities of a family-style restaurant. Such a conclusion is further supported by various declarations: the insurance policy is described as a "Restaurant PAC" and the business was described as "Family Style." Aplt. App. 151.

Although Mr. Saiz attended to the premises each day and utilized an office

on-site, neither he nor the corporation continued to operate the premises as a restaurant after July 2004. Mr. Saiz testified that he kept the premises in top condition, even performing some remodeling and renovation work, and would utilize the entire premises when giving a tour to prospective buyers. See Aplt. Br. 15. Brighton contends that customary business operations includes efforts to sell the business. Mr. Saiz admitted that the office that he occupied after the closure of the restaurant consisted of approximately 500-600 square feet of the total 5,000 square feet of the premises. This is, at most, 12% of the total square footage of the premises. Although, at certain times, Mr. Saiz may have accessed and attended to the entire premises, the premises were no longer being used as a family-style restaurant—the business pursuit identified by the policy. Because we conclude that, at the time of the loss, the business could not have been utilizing more than 31% of the premises for customary operations, the district court properly held that, based on the uncontroverted evidence, the building was vacant under the policy terms.

B. Vandalism Limitation

Brighton next claims that disputed questions of material fact remain regarding whether the vandalism limitation for vacant buildings applies. The policy does not define the term "vandalism," but the dictionary definition will do: "willful or malicious destruction or defacement of public or private property." Webster's Ninth New Collegiate Dictionary 1303 (1991). The Knott Laboratory

report concluded that "[t]he cause of the failure of the subject sprinkler head was from deliberate tampering that required a series of actions to effect the observed damages." Aplt. App. 327. As Charter Oak highlights, Brighton did not dispute these findings; it never deposed the author of the Knott Laboratory report, nor did it retain its own expert. Aplt. Br. 17-18, Aplt. App. 138. Brighton argues that the report never used the particular term "vandalism," and that it should be allowed to cross-examine Charter Oak's witnesses to see if Charter Oak has met its burden. Aplt. Br. at 17. Brighton further argues that Charter Oak could not plausibly prove who might have vandalized the sprinkler head, and notes that there was no evidence to suggest Mr. Saiz personally vandalized the property. Aplt. App. 365. These arguments, however, do not create a genuine issue of material fact concerning whether the sprinkler head was vandalized given the evidence. The policy does not require that the vandal be found or identified. Deliberate tampering resulting in "physical damage" to the sprinkler head in question fits comfortably with willful or malicious destruction of property, i.e. vandalism. None of Brighton's arguments are sufficient to create a disputed issue of material fact as to the application of the vandalism limitation.

   C. Sprinkler Leakage and Water Damage Limitations

Brighton argues that it is entitled to coverage because of the sprinkler leakage limitation, which may provide coverage for damages falling under its rubric if a sprinkler system is protected against freezing. It further argues that the

water damage limitation cannot take away that coverage. It is uncontroverted that the damage in this case did not arise from freezing, which seems to be the covered peril in the sprinkler leakage limitation. Though an interesting issue, we need not determine the relationship between the two provisions because the vandalism limitation operates independently to preclude coverage. As set out above, the policy provides that "[w]e will not pay for any loss or damage caused by <u>any</u> of the following[,]" including "[v]andalism." Aplt. App. 165 (emphasis added).

## II. Bad Faith Breach of Insurance Contract

Finally, Brighton claims that the district court erred in dismissing its claim for bad faith breach of insurance contract. "For an insured to prevail on a bad faith breach of contract claim against an insurer, the insured must establish the insurer acted unreasonably and with knowledge or reckless disregard of its unreasonableness." <u>Parsons ex rel. Parsons v. Allstate Ins. Co.</u>, 165 P.3d 809, 814-15 (Colo. Ct. App. 2006) (citing <u>Dale v. Guar. Nat'l Ins. Co.</u>, 948 P.2d 545, 551 (Colo. 1997)). "The determination of whether an insurer has breached its duties to an insured in bad faith is one of reasonableness under the circumstances." <u>Id.</u> at 815 (citing <u>Surdyka v. DeWitt</u>, 784 P.2d 819, 822 (Colo. Ct. App. 1989)).

Brighton claims that Charter Oak acted in bad faith by (1) concluding that the restaurant was vacant after Mr. Saiz noted that he continued to work in an

office in the building, and (2) rejecting the claim on the basis of vandalism when, according to Brighton, "not one individual has given it an opinion that the damage was due to vandalism." Aplt. Br. 21. Brighton additionally suggests that Charter Oak's internal emails evidence bad faith, and that a mere statement regarding what Charter Oak would not be paying on this claim demonstrates a preference for the company's financial interests over its insured. Aplt. Br. 21-22.

This is insufficient to create a genuine issue of material fact on bad faith. Charter Oak responded immediately to Mr. Saiz's initial notification of a potential claim by sending a representative to the premises the day after the loss. Aplt. App. 136, 335. After the initial denial of the claim, and upon receipt of a letter from Mr. Saiz providing additional information regarding the vacancy and heating issues at the premises, Charter Oak re-opened its investigation. Aplt. App. 137, 335. In its further investigation, Charter Oak hired Knott Laboratory to conduct an investigation into the cause of the damage. Aplt. App. 137, 335. Mr. Saiz did not present any evidence to contradict Knott Laboratory's findings. Aplt. App. 138, 336. Furthermore, Charter Oak examined Mr. Saiz under oath on April 28, 2005, as part of its investigation. Aplt. App. 137, 335. Only after the conclusion of its investigation did Charter Oak again deny the claim. In light of these several steps taken by Charter Oak to investigate and apply the facts to the

policy, summary judgment in favor of Charter Oak was required.

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge