RHINO LININGS USA, INC., Petitioner,

v.

ROCKY MOUNTAIN RHINO LINING,
INC., Respondent.

No. 01SC447.

Supreme Court of Colorado,
En Banc.

Jan. 13, 2003.

Rehearing Denied Feb. 3, 2003.

Baker & Hostetler LLP, Marc D. Flink, Laurin D. Quiat, Denver, Colorado, Attorneys for Petitioner.

Robinson Waters & O'Dorisio, P.C., Harold R. Bruno, III, Krys Boyle Freeman & Sawyer, P.C., Thomas Boyle, Denver, Colorado, Attorneys for Respondent.

Justice BENDER delivered the Opinion of the Court.

## I. Introduction

In this case, we review *Rocky Mountain Rhino Lining, Inc. v. Rhino Linings USA, Inc.*, 37 P.3d 458 (Colo.App.2002), in which the court of appeals affirmed the trial court's treble damage award to Rocky Mountain Rhino Lining, the plaintiff, pursuant to the Colorado Consumer Protection Act (CCPA).

In our view, the evidence does not support an actionable CCPA claim. Hence, we hold that the claim presented in this case fails to

establish two necessary elements for a private cause of action under the CCPA. First, the plaintiff failed to establish that the defendant engaged in a deceptive trade practice, which requires a false statement of fact that either induces the recipient to act or has the capacity to deceive the recipient. Second, even assuming the existence of a deceptive trade practice, the defendant's conduct did not have a significant impact on the consuming public, but instead was private in nature. Accordingly, Rocky Mountain Rhino Lining's remedy in this case is limited to breach of contract.

Our resolution of Rocky Mountain Rhino Lining's CCPA claim renders it unnecessary for us to reach the question of whether a dealership is a franchise, and therefore property, under the CCPA. Because this issue was not properly raised, briefed, or argued to the court of appeals, we do not resolve this issue and leave it for another day. Thus, we reverse the judgment of the court of appeals, vacate the section of the opinion which concludes that a distributorship is a franchise, and remand this case to the court of appeals with directions to return it to the trial court to vacate the judgment for damages, costs, and fees associated with the CCPA claim.

## II. Facts and Proceedings Below

Defendant Rhino Linings USA, Inc. (Rhino) manufactures polyurethane chemical products and distributes them with spray machines to coat truck beds, roofs, floors, decks, and industrial surfaces. It markets its products nationwide through a network of approximately 422 dealers in the United States and an additional 130 worldwide. It attracts dealers through a variety of advertisements in magazines, direct mail, and at wholesale and retail trade shows.

Gary Snyder, the plaintiff, negotiated and entered a dealer contract with Rhino. During negotiations, Snyder was represented by counsel and provided the opportunity to review the contract and make necessary changes. The final agreement granted Snyder and his company, Rocky Mountain Rhino Lining, Inc., an exclusive territory in Adams County to sell Rhino products.[1] Rhino could not appoint another dealer or sell its products to another dealer in Adams County. However, the contract provided that while a dealer could not operate a dealership or receive product shipments in Snyder's territory, another dealer could bid on and install projects in Snyder's exclusive territory.[2]

Subsequently, Rhino negotiated and executed another dealer contract with a third party, Frederick Schaefer. Schaefer, who had advanced degrees and industry experience, indicated during negotiations with Rhino that he wanted to base his business out of his home in Adams County. Rhino informed Schaefer that because Adams County was already occupied by another dealer, he had to select an unoccupied county. Because Schaefer planned to operate his business from a truck and trailer and install projects on-site rather than from a fixed location with a storefront, he did not consider an assigned territory to be overly important. Accordingly, he accepted a territorial assignment for Clear Creek County with the understanding that he could still solicit business in any dealer's territory. His dealer contract contained several provisions to ensure that Snyder's territorial exclusivity would be protected: it listed a Clear Creek address for mailing and correspondence pur-

---

1. The "exclusive territory limitations" provision of the Rhino Linings USA dealer contract provides:

   During the continuance of THIS AGREEMENT, RHINO shall not appoint any other distributor or different person, firm, or corporation to sell or distribute the same products and services in any exclusive geographic area granted to DEALER. RHINO agrees that RHINO will not sell/place any of RHINO's products, equipment or services under the RHINO name or any other name, to any business entity located within DEALER's Exclusive Territory, if said business entity intends to offer RHINO products or services for sale.

2. The "free to solicit business" provision of the Rhino Linings USA dealer contract provides:

   It is agreed that it is to the benefit of all parties that RHINO and all its authorized DEALERS be free to solicit business from any source. Subcontracting of work is encouraged. The terms and conditions will be negotiated in good faith between or among RHINO and its various DEALERS as the situation warrants.

poses, it established Schaefer's base of operations in Clear Creek, and it precluded Schaefer from applying Rhino products to commonly sized pickup trucks, the focus of Snyder's business in Adams County.

The record reveals inconsistent facts concerning Schaefer's negotiations and subsequent dealings with Rhino that were not resolved by the trial court's findings. It was disputed whether Rhino falsely stated that it could ship products to Schaefer in Adams County without violating Snyder's exclusivity, and therefore induced Schaefer to execute his dealer contract or had the capacity to deceive him. Schaefer testified that Rhino made such assurances during negotiations. On the other hand, there was testimony to the effect that Rhino made no such assurances, but rather took steps to preserve Snyder's exclusivity. Additionally, there appears testimony that Rhino's shipment of products to Schaefer's Adams County address was inadvertent and that Rhino became aware of these shipments, but only after Snyder objected.

Unlike the disputed issues of what Rhino told Schaefer about Snyder's exclusive territory and what Rhino knew when it shipped products to Schaefer in Adams County, the following facts are undisputed. Both Schaefer and Rhino knew that the only function of Schaefer's Clear Creek address listed in his dealer contract was for Schaefer to receive mail. Because of the lengthy commute from his home in Adams County, Schaefer never intended to sell Rhino products in Clear Creek County, and he did not install a project there. He also incorporated, banked, and completed projects in Adams County,

and in addition to having Rhino ship products to him in Clear Creek, he requested and received shipments in Boulder County and to his home in Adams County.

Snyder brought suit, initially against Rhino for breach of contract, and against Schaefer and another dealer for tortious interference with contract.[3] Snyder later amended his complaint to include a claim alleging a CCPA violation. Snyder alleged that Rhino had violated section 6-1-105(1)(e), 2 C.R.S. (1997)[4] when it falsely represented to Schaefer that he could operate a mobile unit from his home in Adams County without encroaching upon Snyder's territory.

At a bench trial, Snyder claimed that Rhino violated the CCPA when it failed to honor several of its numerous dealer contracts, including its contract with him and its contract with a New Mexico dealer, Charles Greene.[5] He sought costs, fees, and treble damages pursuant to sections 6-1-113(2)(a) and (b).

The trial court ruled that Rhino breached its contract with Snyder when it sold its products to Schaefer in Adams County and entered judgment against Rhino. The trial court additionally ruled that Snyder proved a claim under the CCPA because Rhino engaged in the deceptive trade practice of selling dealerships, and this practice coupled with Rhino's dealership advertisements significantly impacted prospective dealer-purchasers. The trial court, however, did not resolve the disputed factual issues of whether Rhino knowingly made false representations to Schaefer or to Greene that had the capacity to deceive or induced either to contract

---

3. Rhino filed a cross-claim against Schaefer for breach of contract, indemnification, and tortious interference with contract. Subsequently, Schaefer cross-claimed against Rhino for rescision based on failure of consideration and misrepresentation. Schaefer alleged three misrepresentations: (1) that Rhino's products were suitable for industrial applications, (2) that Rhino would continue to refine and develop products for industrial applications, and (3) that Rhino would submit its products for testing by recognized authorities. Prior to trial, Schaefer settled with Snyder and Rhino.

4. Section 6-1-105(1)(e) provides:

(1) A person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person: (e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith.

5. Greene testified that Rhino had violated his dealer contract both by placing another dealer in his exclusive territory and by failing to honor a right of first refusal clause for a territory in New Mexico and Texas that he had selected.

with Rhino.[6]

The court of appeals affirmed and interpreted the trial court's ruling, stating that Rhino "violated the CCPA by advertising and selling dealerships that promised territorial exclusivity as part of a dealer's contract, with no intention to honor that promise." *Rocky Mountain Rhino Lining, Inc.*, 37 P.3d at 462. The court of appeals reasoned that Rhino committed a deceptive trade practice because Rhino promised Snyder exclusive territory that it never intended to honor; Schaefer was assured that he could operate his dealership from Adams County despite Snyder's presence there; and Rhino permitted another dealer to operate in Greene's New Mexico territory. *Id.*

After concluding that Rhino's challenged conduct constituted a deceptive trade practice, the court of appeals held that Schaefer met the public impact requirement for the following reasons: at least Snyder, Schaefer, and Greene were affected by Rhino's misrepresentations; a large company is generally more sophisticated than individual consumers; and the record supports a finding that the deceptive trade practice would impact future consumers. *Id.* at 463. Lastly, the court of appeals concluded that a dealership is a·franchise over which a dealer may exercise a right of possession, use, and enjoyment, and accordingly, a dealership is property. *Id.*

We granted certiorari to review the judgment of the court of appeals.[7]

**6.** Parenthetically, we point out that Snyder executed his contract with Rhino in 1992 but filed his complaint in 1997, after he learned of Schaefer's violations of his contract in 1996. Therefore, Snyder could not bring a CCPA claim against Rhino for misrepresentations made to induce him to enter into his contract because it was barred by the CCPA's three-year statute of limitations. *See* § 6–1–115. However, his breach of contract action was not barred by the three-year statute because this three-year time period commenced when Snyder learned in 1997 of the contract violation by Rhino. *See* § 13–80–101, 5 C.R.S. (2002).

**7.** We granted certiorari on the following issues: 1. Whether the court of appeals erred in holding that a private contractual obligation is a misrepresentation actionable under the CCPA.

## III. Analysis

### A. The CCPA

■ The CCPA was enacted to regulate commercial activities and practices which, "because of their nature, may prove injurious, offensive, or dangerous to the public." *People ex rel. Dunbar v. Gym of America, Inc.*, 177 Colo. 97, 112, 493 P.2d 660, 667 (1972); *see also Martinez v. Lewis*, 969 P.2d 213, 220 (Colo.1998); *People ex rel. MacFarlane v. Alpert Corp.*, 660 P.2d 1295, 1297 (Colo.App.1982). The CCPA deters and punishes businesses which commit deceptive practices in their dealings with the public by providing prompt, economical, and readily available remedies against consumer fraud. *Showpiece Homes, Corp. v. Assurance Co. of America*, 38 P.3d 47, 50–51 (Colo.2001); *Martinez*, 969 P.2d at 222; *Curragh Queensland Min. Ltd. v. Dresser Indus., Inc.*, 55 P.3d 235, 240–41 (Colo.App.2002); *MacFarlane*, 660 P.2d at 1297. Remedies include injunctive relief, civil penalties including treble damages, and attorney fees. *Showpiece Homes*, 38 P.3d at 51; § 6–1–110, § 6–1–113.[8]

■ To prove a private cause of action under the CCPA, a plaintiff must show:

(1) that the defendant engaged in an unfair or deceptive trade practice;

(2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation;

2. Whether the court of appeals erred in holding that there was a significant impact on the consuming public from Rhino's breach of its contract with Snyder so as to be separately actionable under the CCPA.
3. Whether the court of appeals erred in concluding that Rhino's dealership is a franchise, and therefore property under the CCPA.

**8.** While the availability of treble damages and attorney fees is intended to promote private enforcement of the CCPA, the Act vests concurrent enforcement ability with the attorney general and district attorneys of the several judicial districts of the state. *Showpiece Homes*, 38 P.3d at 51; § 6–1–103, 2 C.R.S. (2002).

(3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;

(4) that the plaintiff suffered injury in fact to a legally protected interest; and

(5) that the challenged practice caused the plaintiff's injury.

*Hall v. Walter,* 969 P.2d 224, 235 (Colo.1998).

In this case, the first and third elements are in dispute. The practical significance of this concerns whether the trial court erred by trebling damages and awarding fees and costs under the CCPA to Snyder.

### B. CCPA requirements to prove a deceptive trade practice and a significant public impact

We first address what a plaintiff must prove to establish a deceptive trade practice. We then discuss our standards for determining whether the challenged conduct has a significant public impact.

■ Section 6–1–105(1)(e) requires that to establish a deceptive trade practice, the plaintiff must show that a defendant "knowingly makes a false representation." Although we have not previously defined "false representation" within the context of the CCPA, we have discussed the types of deceptive trade practices that the CCPA seeks to prohibit. Considering our precedent and decisions of other jurisdictions, we conclude that a false representation must either induce a party to act, refrain from acting, or have the capacity or tendency to attract consumers.

In *People ex rel. Dunbar*, we noted that deceptive trade practices can induce parties to act on the basis of false or misleading information, or what we have previously referred to in non-CCPA cases as misrepresentations: [9]

When consumers are induced to purchase inferior merchandise or services as a result of misleading solicitations, when the public is attracted to business concerns on the basis of statements falsely announcing the existence of products which are in fact non-existent, and when citizens discover that the product they have acquired carries with it a set of obligations which they did not intend to purchase, it is clear that the state's general and financial welfare is thereby aggrieved.

177 Colo. at 112, 493 P.2d at 667.

■ A misrepresentation, which is a false or misleading statement that induces the recipient to act or refrain from acting, is actionable when it is made "either with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive the plaintiff." *Parks v. Bucy,* 72 Colo. 414, 418, 211 P. 638, 639 (1922). *See also Brown v. Linn,* 50 Colo. 443, 448, 115 P. 906, 908 (1911) ("These misrepresentations related to the subject of the transaction, and were of such a character that they would naturally induce [plaintiff] to make the exchange, and were followed by the exchange."); *People v. Lewis,* 710 P.2d 1110, 1116–17 (Colo.App. 1985); *Stalos v. Booras,* 34 Colo.App. 252, 255–56, 528 P.2d 254, 255–56 (1974); Restatement (Second) of Contracts, Introductory Note, Ch. 7 (1979).

Thus, a party may establish a deceptive trade practice by proof that a defendant knowingly made a misrepresentation that induces a party's action or inaction—that is, section 6–1–105(1)(e)'s requirement for a "false representation." In *People ex rel. Dunbar*, we additionally reasoned that "it is in the public interest to invoke the state's police power to prevent the use of methods that have a *tendency or capacity to attract customers* through deceptive trade practices." [10]  177 Colo. at 113, 493 P.2d at 668 (emphasis added).

---

**9.** This definition appears consistent with the court of appeals' statements, which refer to Rhino's "misrepresentations," while the statutory language of section 6–1–105(1)(e) requires a false representation. *Rocky Mountain Rhino Lining, Inc.,* 37 P.3d at 463.

**10.** In reaching this conclusion, we relied upon the following federal cases: *Dr. W.B. Caldwell, Inc. v. F.T.C.,* 111 F.2d 889 (7th Cir.1940); *F.T.C. v. R.F. Keppel and Bros.,* 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814 (1934); *F.T.C. v. Winsted Hosiery Co.,* 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729 (1922); *Ford Motor Co. v. F.T.C.,* 120 F.2d 175 (6th Cir.1941).

Thus, a plaintiff may satisfy the deceptive trade practices requirement of section 6–1–105(1)(e) by establishing either a misrepresentation or that the false representation had the capacity or tendency to deceive, even if it did not. Similarly, courts in other jurisdictions have also concluded that either proof of a misrepresentation or proof that the representation had the capacity to deceive will satisfy the deceptive trade practices requirement.[11]

Although a plaintiff may establish a false representation under the CCPA by establishing a knowing misrepresentation, that representation is distinguishable from a contractual promise. Because the court of appeals concluded that Rhino committed a deceptive trade practice in part because of promises made by Rhino, we briefly address the distinction between a contractual promise and a misrepresentation.

■ A promise cannot constitute a misrepresentation unless the promisor did not intend to honor it at the time it was made. *See Brody v. Bock*, 897 P.2d 769, 776 (Colo. 1995); *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1362 (Colo.1993). A promise demonstrates a party's intent to act or not act in a specific way. This demonstration of intent, in turn, justifies the promisee in understanding that a commitment exists and binds the promisor to the happening of the future promised event. *Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256, 1262 (Colo.2000); Restatement (Second) of Contracts § 2(1) (1979).

■ If a party to a contract fails to perform a promise mutually bargained for and agreed upon by the parties, then the remedy is an action for breach. *See* 1 Williston on Sales (2d Ed.), § 212; *Grynberg v. Agri Tech, Inc.*, 985 P.2d 59, 62 (Colo.App.1999) ("If the duty allegedly owed by one party to another is created by the terms of a contract and the damages sought arise from a breach of the duties set forth under the contract, then the cause of action lies in contract."), *aff'd by Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267 (Colo.2000).

■ Unlike a breach of contract claim, which arises when one contracting party breaks a promise, a CCPA claim arises when a party knowingly makes a misrepresentation or makes a false representation that has the capacity to deceive. A breach of contract claim, without additional conduct, cannot constitute an actionable claim under the CCPA. "The basis for a contract action is the parties' agreement; to succeed under the consumer protection law, one must show not necessarily an agreement, but in all cases, an unfair or deceptive practice." *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 233, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (concerning the Illinois Consumer Protection Act). *See also Golembiewski v. Hallberg Ins. Agency, Inc.*, 262 Ill.App.3d 1082, 200 Ill.Dec. 113, 635 N.E.2d 452, 460 (1994) ("the [consumer fraud] Act should not apply to simple breach of contract claims.").

■ Having set forth the requirements needed to establish the false representation requirement of section 6–1–105(1)(e) and its

---

11. *See, e.g., Snierson v. Scruton*, 145 N.H. 73, 761 A.2d 1046, 1051–52 (2000) (allegations of a misrepresentation that induced plaintiffs to contract "support a claim of unfair or deceptive trade practices under the Consumer Protection Act."); *Riley v. Commercial Ins. Agency, Inc.*, 1999 WL 799216, *4 (Mass.App.Div.1999) (misrepresentations made to induce the execution of a contract are unfair and deceptive acts under the consumer protection statute); *Brody v. Finch University of Health Sciences/The Chicago Medical School*, 298 Ill.App.3d 146, 232 Ill.Dec. 419, 698 N.E.2d 257, 267 (2 Dist., 1998) (a plaintiff seeking to establish a violation of the state consumer fraud act must establish in part that the defendant committed a deceptive act, such as misrepresentation or concealment of material fact, and that the defendant intended to induce reliance on that deception); *Dix v. American Bankers Life Assurance Co.*, 429 Mich. 410, 415 N.W.2d 206, 209 (1987) (determining whether to certify a class which claimed that defendants made material misrepresentations to persuade them to contract, "It is sufficient if the class can establish that a reasonable person would have relied on the representations."); *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 719 P.2d 531, 535 (1986) ("A plaintiff need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion of the public."); *McNeill v. McDavid Ins. Agency*, 594 S.W.2d 198, 203 (Tex.Civ.App.1980) (whether challenged conduct is a deceptive trade practice depends in part on the intent to deceive or induce a party into a transaction).

distinction from a breach of contract claim, we discuss the public impact requirement that we set forth in *Hall*. *Hall* requires that a plaintiff must establish not only that the defendant engaged in a deceptive trade practice, but also that the defendant's challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property. 969 P.2d at 234; *United States Welding, Inc. v. Burroughs Corp.,* 615 F.Supp. 554, 555 (D.Colo. 1985). Thus, if a wrong is private in nature, and does not affect the public, a claim is not actionable under the CCPA.

■ Our cases outline relevant considerations to determine whether a challenged practice significantly impacts the public within the context of a CCPA claim. These considerations include (1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future. *Martinez,* 969 P.2d at 222.

Having outlined the appropriate legal standards in which to evaluate an action raised under section 6–1–105(1)(e) of the CCPA, we now apply them to this case.

## IV. Application

### A. Snyder failed to prove a deceptive trade practice

The court of appeals concluded that Rhino committed a deceptive trade practice in part because of Rhino's promise of exclusivity to Snyder. However, Snyder did not claim, nor did he argue that he was falsely misled into entering his dealer contract with Rhino. We assume that the trial court made no findings concerning Rhino's representations to Snyder that led to Snyder agreeing to this contract because any claim based upon Rhino's representations would have been barred by the CCPA's statute of limitations. *See* § 6–1–115. Our review of the record conflicts with and does not support the court of appeals' statement that Rhino promised territorial exclusivity "with no intention to honor

that promise." *Rocky Mountain Rhino Lining, Inc.,* 37 P.3d at 462.

■ Absent a finding of fact that Rhino did not intend to honor its promise of exclusivity at the time the contract was executed, this promise to perform cannot constitute a misrepresentation. However, Rhino's promise of territorial exclusivity to Snyder combined with subsequent shipments to Schaefer in Adams County constituted a breach of this promise but not a deceptive trade practice under the CCPA. Accordingly, Snyder's theory of recovery is limited to breach of contract.

■ Turning to Snyder's argument that Rhino engaged in a deceptive trade practice by telling Schaefer that it could ship products to him in Adams County without violating Snyder's exclusivity provision, we reason that Rhino's statements do not constitute the deceptive trade practices requirement for two reasons.

First, the alleged false representations to Schaefer are factually in dispute. The trial court made no specific findings that Schaefer entered into his dealer contract because of Rhino's false or misleading statements. The trial court also made no findings that Rhino's alleged false statements had the tendency or capacity to attract Schaefer as a purchaser-dealer. Absent these necessary findings of fact, we cannot conclude that the record supports a deceptive trade practice.

Second, even if we were to assume that Rhino had committed a deceptive trade practice when it allegedly made a false representation to Schaefer, we do not find Snyder's analogy to *Hall* persuasive and conclude that in these circumstances, Snyder has failed to establish a CCPA claim as a matter of law. In *Hall,* we held that a misrepresentation made to a third party may be actionable under the CCPA in some circumstances. 969 P.2d at 230. That case involved the sale of subdivided lots to the public. The defendant-developers made false representations to third-party prospective buyers that the development had an access route across the plaintiffs' property, thereby deceiving purchasers and encouraging them to buy subdivided lots. *Id.* at 235. As a result, buyers

purchased lots with the understanding that they possessed rights of access, and these new purchasers subsequently trespassed on the plaintiffs' property. Because the defendant-developers' representations to third parties caused injury to the plaintiffs, who had no contractual relationship with the defendants, we held that the plaintiffs had standing under the CCPA. *Id.* at 238.

In this case, the contractual relationship between Snyder and Rhino offers Snyder a theory of recovery not available to the plaintiff-landowners in *Hall.* Snyder, unlike the *Hall* plaintiffs, would have suffered no harm but for Rhino's breach of his dealer contract. In addition, unlike this case, the trial court in *Hall* found that the third-party purchasers of lots had been deceptively induced to buy because of the defendants' false information.

For these separate and independent reasons, we hold that Snyder has not established that Rhino engaged in a deceptive trade practice by knowingly making a false statement under the CCPA.

### B. Snyder failed to prove a significant public impact

▇▇ Even if we assume that Snyder established a deceptive trade practice, there exists no record support to justify a finding of significant public impact. Three affected dealers out of approximately 550 worldwide does not significantly affect the public, especially when the proper remedy, at least for Snyder and Schaefer, is a private breach of contract action. When a transaction is no more than a private dispute, as is the case here, "it may be more difficult to show that the public has an interest in the subject matter...." *Hall,* 969 P.2d at 238 (Scott, J., dissenting) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wash.2d 778, 719 P.2d 531, 538 (1986)); *United States Welding, Inc.,* 615 F.Supp. at 555 ("the Act is intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to redress a purely private wrong.") (citing *Newman–Green, Inc. v. Alfonzo–Larrain,* 590 F.Supp. 1083, 1086 (N.D.Ill.1984)).

In addition to the challenged conduct being private in nature, Snyder was represented by counsel in negotiations with Rhino and Schaefer was relatively sophisticated in his education and knowledge of the business of selling this product when he negotiated his contract with Rhino.

Supporting the lack of public impact is Rhino's alleged misrepresentation to Schaefer of Snyder's exclusivity, which appears only to impact Schaefer and Snyder as prospective consumers of dealerships, and not the general public. Our review of Rhino's public advertisements reveals nothing disingenuous about the nature or exclusivity of dealership territories. Rather, they indicate only that dealerships are available in selected areas. We contrast Rhino's advertisements, which contain no deception, with the defendant-developers' advertisements in *Hall,* where we concluded that the defendants' widespread advertisements had a significant public impact because the public was told important facts by the defendant which were untrue.

For these reasons, our review of the record leads us to conclude that there was no significant public impact in this case.

### C. It is unnecessary to determine whether a dealership is a franchise

Lastly, the court of appeals concluded that because a dealership "over which a dealer exercises a right of possession, use, and enjoyment" is a franchise, a dealership is "property" within the definition of the CCPA. The issue of whether a dealership is a franchise was neither litigated at trial nor briefed to the court of appeals.

Because we hold that Snyder does not have an actionable claim under the CCPA, we need not reach the issue of whether a dealership is a franchise for CCPA purposes. Thus, while this issue is significant, we vacate that portion of the court of appeals' opinion and reserve its resolution for another proceeding.

### V. Conclusion

For the reasons discussed, Snyder has not established a private cause of action under the CCPA. Hence, we reverse the court of

appeals' judgment and remand this case to it with directions to return it to the trial court to vacate the judgment for damages, costs, and fees associated with the CCPA claim.