**GENERAL STEEL DOMESTIC SALES, LLC, d/b/a General Steel Corporation, a *Colorado limited liability company*; and Jeffrey W. Knight, Plaintiffs–Appellants,**

v.

**HOGAN & HARTSON, LLP, a foreign limited liability partnership; and Ty Cobb, Defendants–Appellees.**

No. 09CA0252.

Colorado Court of Appeals, Div. VI.

March 18, 2010.

Davis Graham & Stubbs, LLP, Andrew M. Low, Victoria V. Johnson, Terry R. Miller,

Denver, Colorado; Robert J. Shilliday III, Littleton, Colorado, for Plaintiffs–Appellants.

Haddon, Morgan & Foreman, P.C., Harold A. Haddon, Saskia A. Jordan, Ty Gee, Denver, Colorado, for Defendant–Appellee Hogan & Hartson, LLP.

Rothgerber, Johnson & Lyons, LLP, James M. Lyons, Hilary D. Wells, Denver, Colorado, for Defendant–Appellee Ty Cobb.

Opinion by Chief Judge DAVIDSON.

Plaintiffs, General Steel Domestic Sales and Jeffrey W. Knight, appeal from the C.R.C.P. 12(b)(5) dismissal of their Colorado Consumer Protection Act (CCPA) claim against defendants, Hogan & Hartson, LLP and Ty Cobb, and from that part of the judgment precluding plaintiffs from recovering consequential damages in their claim of breach of contract. We affirm in part, reverse in part, and remand.

## I. Background

These facts are not disputed: plaintiffs retained Ty Cobb and his firm, Hogan & Hartson, to defend General Steel against an action brought by the Colorado Attorney General (the Colorado AG action). According to plaintiffs, they sought Cobb's services because they were aware, based on a *Denver Post* article and other references, that Cobb was experienced in representing white collar defendants in complex, high-stakes cases like the Colorado AG action. The parties' representation agreement provided, as relevant here, that Cobb would "have primary responsibility for the matter, with assistance as required from ... other attorneys in the litigation group," and that the parties would submit any dispute over legal fees to binding arbitration.

Cobb was actively engaged in the Colorado AG action for approximately two months, but then moved his practice to Hogan & Hartson's Washington, D.C. office, effectively terminating his involvement in General Steel's defense. Although other Hogan & Hartson attorneys remained active in the case, plaintiffs retained another law firm. Thus, for the remainder of the Colorado AG action, plaintiffs were represented by, and paid legal fees to, both Hogan & Hartson and the other firm. Ultimately, plaintiffs settled the action with the Colorado AG.

Plaintiffs subsequently initiated this action against Cobb and Hogan & Hartson, alleging fraud, breach of fiduciary duty, breach of contract, and violation of the CCPA. As relevant here, the CCPA claim included allegations that defendants had engaged in the "deceptive trade practice" of " 'bait-and-switch' advertising" as defined in section 6–1–105(1)(n)(I), C.R.S.2009. In response, defendants filed a motion to dismiss the CCPA claim and a motion to compel arbitration of the contract claim pursuant to the terms of the parties' representation agreement.

The trial court granted both of defendants' motions.

First, it dismissed plaintiffs' CCPA claim on the ground that the complaint failed to assert that defendants' allegedly deceptive trade practice significantly impacted the public. Second, the court agreed with defendants that the fraud and breach of fiduciary duty claims were, essentially, legal malpractice claims alleging negligence and, therefore, were time-barred by the applicable statute of limitations.

Finally, the court referred plaintiffs' breach of contract claim to arbitration. However, to the extent plaintiffs sought consequential damages beyond legal fees paid, the court ruled that such damages were identical to those plaintiffs could have claimed in a negligence action and, therefore, were precluded.

At the arbitration, Hogan & Hartson claimed that plaintiffs owed legal fees in addition to those they had already paid. Plaintiffs responded by reviving, as compulsory counterclaims, their claims of fraud, breach of fiduciary duty, and negligent misrepresentation. Because the court had dismissed their CCPA claim on the merits, however, plaintiffs did not revive that claim. Ultimately, the arbitrator found for plaintiffs on their breach of contract claim, and for defendants on each of plaintiffs' counterclaims, specifically finding that defendants had not intended to deceive or defraud plaintiffs.

On appeal, plaintiffs contend that the trial court erred by (1) dismissing their CCPA "bait and switch" claim and (2) precluding recovery of consequential damages on their breach of contract claim.

## II. The CCPA "Bait and Switch" Claim

In determining a motion to dismiss, the court considers the facts alleged in the pleadings, taking them as true and viewing them in the light most favorable to the plaintiff, as well as documents attached to, incorporated by reference in, or otherwise referred to in the complaint. *See Walker v. Van Laningham*, 148 P.3d 391, 397 (Colo.App.2006) (considering document referenced in complaint but submitted in response to motion to dismiss); *Yadon v. Lowry*, 126 P.3d 332, 336 (Colo.App.2005) (document not formally referenced but referred to in complaint is not considered a matter outside of the pleadings). A court also may consider facts of which it may take judicial notice. *Walker*, 148 P.3d at 397 (court may take judicial notice of certain matters without converting motion to dismiss to one for summary judgment).

■ Applying the same standards, we review de novo the trial court's C.R.C.P. 12(b)(5) dismissal of plaintiffs' CCPA claim. *See Sweeney v. United Artists Theater Circuit*, 119 P.3d 538, 539 (Colo.App.2005). On three grounds, we conclude that dismissal was proper.

## A. Public Impact

In its order, the trial court determined that the allegations in plaintiffs' complaint, taken as true, were insufficient to show that defendants' allegedly deceptive trade practice significantly impacted the public. Plaintiffs contend that, to the contrary, the complaint adequately pleaded the requisite public impact element. We disagree.

### 1. The CCPA's Public Impact Element

■ A claim brought pursuant to the CCPA must allege, inter alia, that the defendant's actions have a significant impact upon the public. *Hall v. Walter*, 969 P.2d 224, 234 (Colo.1998). To adequately make this allega-

tion, plaintiffs' complaint must meet the low burden of setting forth facts that, if proved, could establish a public impact "upon any theory of the law." *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1100 (Colo. 1995) (quoting *Hinsey v. Jones*, 159 Colo. 326, 329, 411 P.2d 242, 244 (1966)) (emphasis omitted).

■ Thus, we must evaluate whether the facts, as presented by plaintiffs and taken in the light most favorable to them, could establish the requisite public impact element. Factors relevant to this evaluation include "the number of consumers directly affected by the challenged practice"; "the relative sophistication and bargaining power of the consumers affected by the challenged practice"; and "evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 149 (Colo.2003) (citing *Martinez v. Lewis*, 969 P.2d 213, 222 (Colo.1998)).

### 2. Sufficiency of Plaintiffs' Allegations

a. Representations made by a provider of goods or services impact the public only if they disseminate false information to the public.

Plaintiffs did not allege that they were unsophisticated in relation to Hogan & Hartson, or that they lacked bargaining power when the parties negotiated their representation agreement. Their focus here, instead, is on their allegation that defendants baited them, and other prospective clients, with "a glowing interview of Cobb in *The Denver Post*." Reasoning that "[m]ass advertising, like [the *Post* article] has an inherent public impact," they argue that because their complaint alleged "[d]efendants employed illegal 'bait and switch' tactics ... by failing to provide legal services as advertised to plaintiffs and other consumers," it sufficiently pleaded public impact.

■ However, in the context of a CCPA claim, even mass advertising cannot be considered to create a public impact unless it contains misrepresentations or deceptive information. *Rhino Linings*, 62 P.3d at 150

(no public impact where franchisor's widespread advertising, which had attracted prospective franchisees, "contain[ed] no deception"); *cf. Hall,* 969 P.2d at 235 ("[T]here is no dispute that [the] deceptive practices implicated the public as consumers because the misrepresentations were directed to the market generally, taking the form of widespread advertisement. . . ."); *compare Martinez,* 969 P.2d at 220–21 (no significant public impact when alleged deceptive practices occurred only in the context of private agreement to provide services), *with Crowe v. Tull,* 126 P.3d 196, 209 (Colo.2006) (misleading lawyer advertising could support CCPA claim where it "potentially affects a large swath of the public via television, print media, radio, and the internet").

 b. Defendants' alleged advertising contained no misrepresentation.

 Thus, because in the context of the requirements of the CCPA an advertisement must convey false information to have a public impact, the question is whether the newspaper article (which we will assume, arguendo, was an advertisement, *see* § 6–1–102(1), C.R.S.2009 (defining advertisement), that was disseminated to a broad public audience), actually represented that Cobb would act as lead counsel on any case for which his services were sought. The answer is no.

We recognize that Cobb is seductively rendered in the article (which lauds Cobb's expertise and his "uncanny ability to portray an unsympathetic client in the most favorable light"), and that the article implies Cobb had primary responsibility for each of the cases it discusses. Nevertheless, to draw from the article a promise that Cobb was willing and able to act as lead counsel on future cases ignores the practical realities of the process by which attorneys attract, negotiate with, and retain clients.

In contrast to the type of deceptive attorney advertising that has been found to significantly impact the public, *see Crowe,* 126 P.3d at 200 (defendant law firm advertised that it could recover money for its clients where other attorneys could not), the *Post* article is more akin to the dozens of attorney directories and profiles, such as Martindale–Hub-

bell, Super Lawyers, and Who's Who, that recognize accomplished attorneys (including Cobb). While these types of profiles undoubtedly serve a rainmaking function, they cannot amount to specific promises concerning availability and personal representation.

This is because, to the extent that such profiles are targeted to attract prospective clients, they nevertheless cannot guarantee that a particular attorney will represent a particular client. A prospective client may be unwilling to comply with the terms of representation, or unable to pay an attorney at his or her standard rate. And, any attorney may be unavailable, due to workload, or unwilling, for any reason, to take on, with primary responsibility or otherwise, a new case or client. Further, an attorney often must decline to represent a client when that representation would create a conflict of interest. *See* Colo. RPC 1.7. Therefore, attorneys routinely evaluate prospective cases based on each one's unique facts and circumstances, making individualized determinations about whether they can represent any particular client.

Here, defendants employed this process in deciding whether they would undertake plaintiffs' representation, making clear, in the parties' representation agreement, for example, that their "professional obligations require [them] to perform a conflict check and not to commence work on a matter if [they] find conflicts of interest that would preclude [them] from doing so." Thus, the *Post* article (and other favorable profiles of Cobb) can reasonably be read to advertise only that, *if retained,* Cobb could provide valuable experience and expertise. *See Colorado Coffee Bean, LLC v. Peaberry Coffee, Inc.,* —— P.3d ——, —— (Colo.App.2010) (declining to expand CCPA to cover an Internet posting providing only general information, and containing nothing "affirmatively 'untrue' ").

Moreover, the facts alleged in plaintiffs' complaint demonstrate that they were well aware of the practical limits to the *Post* article's implications, namely, that they did not interpret it to promise that Cobb would act as lead counsel in their case. To the contrary, their complaint states that, al-

though plaintiffs were impressed with Cobb's curriculum vitae, they remained hesitant to retain him due to concerns that "he would not personally handle the case." Only when the parties met privately to negotiate their representation did plaintiffs request, and Cobb provide, an assurance that he would take personal responsibility for their defense.

These circumstances are similar to those in *Rhino Linings*, where consumers were attracted to a product based on a widely disseminated advertisement, but the court found no public impact because the alleged misrepresentations occurred during private negotiations rather than in the advertisement itself. 62 P.3d at 150; *accord Colorado Coffee Bean,* —— P.3d at —— (no public impact where franchisor's widespread advertising on the Internet was followed by direct solicitation of limited number of potential customers who passed franchisor's screening process); *Curragh Queensland Mining Ltd. v. Dresser Industries, Inc.,* 55 P.3d 235, 241 (Colo.App. 2002) (no public impact where seller advertised costly mining equipment to about 3000 companies, but very few could afford to purchase it).

### B. Intent Element of Bait and Switch

■ Although it had already dismissed plaintiffs' CCPA claim prior to arbitration, after the conclusion of the arbitration (in ruling on issues unrelated to this appeal), the trial court determined, alternatively, that even if its initial C.R.C.P. 12(b)(5) dismissal was erroneous, the findings of the arbitrator that defendants did not intend to deceive plaintiffs barred their CCPA claim through issue preclusion. Plaintiffs argue that this ruling was error because the CCPA's bait and switch advertising provision does not include an intent element, and therefore the arbitrator's finding was irrelevant to their claim. We disagree.

■ Issue preclusion "bars relitigation of issues actually litigated and decided in a prior proceeding." *Gallegos v. Colo. Ground Water Comm'n,* 147 P.3d 20, 32 (Colo.2006).

In reviewing the trial court's interpretation of the CCPA's language, we must give effect to the legislature's intent, *Slack v. Farmers*

*Ins. Exchange,* 5 P.3d 280, 284 (Colo.2000), by looking primarily to the statutory language employed by the General Assembly, *Colo. Dep't of Revenue v. City of Aurora,* 32 P.3d 590 (Colo.App.2001). We must also "interpret[ ] the meaning of any one section by considering the overall legislative purpose," *Crowe,* 126 P.3d at 202 (quoting *May Dep't Stores Co. v. State ex rel. Woodard,* 863 P.2d 967, 973 n. 10 (Colo.1993)), and avoid any interpretation that "defeats the legislative intent," *Hall,* 969 P.2d at 229.

As relevant here, bait and switch advertising is "advertising accompanied by an effort to sell ... services ... other than those advertised or on terms other than those advertised and which is also accompanied by ... [r]efusal ... to offer the services advertised." § 6–1–105(1)(n)(I). Whereas other trade practices defined in section 6–1–105(1) contain language expressly requiring deceptive intent, *e.g.,* § 6–1–105(1)(e), C.R.S.2009 ("*[k]nowingly* makes a false representation") (emphasis added); § 6–1–105(1)(i), C.R.S. 2009 ("[a]dvertises goods, services, or property *with intent* not to sell them as advertised") (emphasis added), section 6–1–105(1)(n)(I) contains no such language. Plaintiffs reason that this variance indicates that the General Assembly *deliberately omitted from its definition of bait and switch advertising any element of deceptive intent.* We disagree.

1. The statute's plain language includes an intent element.

We must, "[i]f possible ... give effect to every word of an enactment." *Hall,* 969 P.2d at 231. Here, the verb "bait," itself, defined as "to entice," or to "lure esp[ecially] by trickery, duplicity, or strategy," *Webster's Third New International Dictionary* 163 (2002), is analogous to "deceive."

Furthermore, the applicable subsection provides that bait and switch advertising must include a "*[r]efusal* to ... offer the services advertised." § 6–1–105(1)(n)(I) (emphasis added). To refuse is to "show or express a positive unwillingness to do or comply with ... something asked, demanded, [or] expected." *Webster's Third New International Dictionary* at 1910. As we read the

statute, the term "refusal" indicates that bait and switch advertising, as defined in subsection (1)(n)(I), includes an intent not to comply with a consumer's expectations.

2. That intent is a necessary element of a "bait and switch" claim is supported by the CCPA's purpose and statutory scheme.

The CCPA was enacted to provide a remedy "against consumer fraud." *Western Food Plan, Inc. v. Dist. Court,* 198 Colo. 251, 256, 598 P.2d 1038, 1041 (1979). Thus, the CCPA empowers the Attorney General and private parties to initiate actions against persons engaged in deceptive trade practices. § 6–1–103, C.R.S.2009; *Rhino Linings,* 62 P.3d at 146 n. 8. "Deceptive trade practices" are defined in section 6–1–105(1), and bait and switch advertising is one of them, § 6–1–105(1)(n).

Although plaintiffs argue that, despite this structure and enforcement scheme, the General Assembly intended to remove any subjective intent element from its definition of bait and switch, it simply is inconsistent for the General Assembly to have included a practice with no subjective intent element under the category of "[d]eceptive trade practices." *See Renco Assocs. v. D'Lance, Inc.,* 214 P.3d 1069, 1071 (Colo.App.2009) (we must interpret the CCPA in a manner that gives it a consistent and harmonious effect and avoids an absurd result); *Crowe,* 126 P.3d at 201 ("The intention of the legislature prevails over a literal interpretation of the statute's plain and ordinary meaning that would produce an absurd result.").

Indeed, the element of intent is a critical distinction between actionable CCPA claims and those sounding merely in negligence or contract. *Rhino Linings USA, Inc.,* 62 P.3d at 148 ("Unlike a breach of contract claim, which arises when one contracting party breaks a promise, a CCPA claim arises when a party knowingly makes a misrepresentation or makes a false representation that has the capacity to deceive."); *see also Crowe,* 126 P.3d at 204 ("A CCPA claim will only lie if the plaintiff can show the defendant *knowingly* engaged in a deceptive trade practice.") (emphasis added); David Benjamin Lee,

Note, *The Colorado Consumer Protection Act: Panacea or Pandora's Box?* 70 Denv. U.L.Rev. 141, 154 (1992) ("The [CCPA] provides an absolute defense to a seller . . . who makes an honest mistake that results in a misrepresentation.").

Here, plaintiffs contend that defendants performed a "bait and switch" even though (as found by the arbitrator) they lacked any intent to pull the "switch." But, as discussed, the legislature did not intend for the CCPA to remedy circumstances in which a person merely fails to provide goods or services as promised. *See, e.g., Rhino Linings USA, Inc.,* 62 P.3d at 149.

Moreover, although no reported decision has specifically evaluated the elements of the CCPA's bait and switch provision, " 'bait and switch' advertising and selling techniques have long been recognized in the legal literature," and they have consistently been conceived of as schemes to lure prospective customers with an advertisement, with the intent not to comply with the advertisement's terms. *People ex rel. Dunbar v. Gym of America, Inc.,* 177 Colo. 97, 109, 493 P.2d 660, 665–66 (1972) (seller advertised discounted products, but when customers inquired, refused to offer discount unless customers purchased additional products). Indeed, each of the scenarios historically recognized as "bait and switch" or "bait advertising" includes an implication that the provider of goods or services specifically intended not to offer the item at all or not at the price advertised. *People v. Sprengel,* 176 Colo. 277, 279–80, 490 P.2d 65, 66 (1971) (hotel advertised room rate even after all rooms available at advertised rate had been booked); *Electrolux Corp. v. Val–Worth, Inc.,* 6 N.Y.2d 556, 190 N.Y.S.2d 977, 161 N.E.2d 197, 203 (1959) (enjoining promotional technique of gaining admittance to customers' homes by advertising product at a deep discount, but subsequently disparaging discounted product and inducing customers to purchase a more expensive model).

Thus, in light of the CCPA's plain language, structure, and regulatory scheme, and the long-recognized, common understanding of "bait and switch" advertising, we conclude that the General Assembly intended the de-

ceptive trade practice of bait and switch advertising to include the element of intent to deceive. Here, because the arbitrator specifically found that defendants had no such intent, we agree with the trial court that issue preclusion barred plaintiffs from asserting their CCPA claim.

### C. The facts as alleged do not constitute a "bait and switch."

 The essence of a bait and switch advertising scheme is the *refusal to offer* a good or service as advertised, not the *failure to provide* the good or service. § 6-1-105(1)(n)(I) (" '[B]ait and switch' advertising ... is advertising accompanied by an effort to sell ... services ... *other than those advertised* [and] ... *[r]efusal to ... offer the services advertised.*...") (emphasis added). Thus, the "switch" must occur at the point of sale, causing the consumer to walk away with something other than what he sought. *E.g.,* *Dunbar,* 177 Colo. at 102–03, 493 P.2d at 662; *Been v. O.K. Industries, Inc.,* 495 F.3d 1217, 1230 (10th Cir.2007) (describing " 'bait and switch' tactic" of advertising one product and then "convinc[ing] customers seeking the product to buy a more expensive one instead"); *Peterman v. U.S. Dep't of Agriculture,* 770 F.2d 888, 890 (10th Cir.1985) (bait and switch occurred when meatpacker advertised beef at one dollar per pound, but customers responding to advertisement were encouraged to buy higher priced cuts); *see also* Comment, *State Control of Bait Advertising,* 69 Yale L.J. 830, 832 (1960) (describing "bait advertising" as situation where "[o]nce contact has been made, the seller ... will *prevent or discourage purchases* of the ... 'bait' ") (emphasis added).

Thus, assuming, arguendo, that the *Post's* profile of Cobb was the "bait," a bait and switch might have occurred, for example, if Hogan & Hartson had refused, upon plaintiffs' initial request, to assign Cobb to the case and, instead, had persuaded plaintiffs to accept a less experienced attorney as lead counsel. However, to the contrary, plaintiffs were not prevented or discouraged from hiring Cobb; rather, Cobb himself met with plaintiffs and promised them that they would receive his services as primary counsel. And

plaintiffs did receive those services, if only for a brief time.

Thus, as alleged, plaintiffs' facts describe a circumstance in which a party failed to perform as promised: a breach of contract, not a bait and switch advertising scheme. *See Keller v. Beckenstein,* 117 Conn.App. 550, 979 A.2d 1055, 1065 (2009) (holding, based on the Connecticut Unfair Trade Practices Act, that no bait and switch occurred when defendant attempted to repudiate a contract).

### III. Consequential Damages for Breach of Contract

Having already ruled that plaintiffs' claims sounding in negligence were time-barred, the trial court determined that their claim for consequential damages "above and beyond legal fees paid," was "fundamentally one of legal malpractice" also barred by the statute of limitations. Because, according to the trial court, "[p]laintiffs [could] not accomplish indirectly, that which they [were] prohibited from doing directly," the court limited plaintiffs' recovery on their breach of contract claim to legal fees paid.

Plaintiffs argue that this ruling was error and that, to the contrary, because their breach of contract claim was separate and distinct from their negligence claim, they should be allowed to seek any damages generally recoverable in a breach of contract action. We agree.

 We review de novo the trial court's legal conclusion that plaintiffs could not claim consequential damages in their breach of contract action. *See E–470 Public Highway Auth. v. 455 Co.,* 3 P.3d 18, 22 (Colo.2000).

### A. The issue is properly before this Court.

 As an initial matter, we reject defendants' argument that plaintiffs judicially admitted that they have no consequential damages. A judicial admission occurs "[w]hen a party makes an unequivocal formal and deliberate declaration in a judicial proceeding for the purpose of dispensing with proof of facts." *Bd. of County Comm'rs v. Rohrbach,* 226 P.3d 1184, 1189 (Colo.App. 2009).

One of plaintiffs' alleged judicial admissions appeared in their complaint, which stated that plaintiffs "do[ ] not claim ... that [they] would have won the [Colorado AG action] if [Cobb] had handled the case personally." The other appeared in plaintiffs' response to Cobb's motion to dismiss, where they explained that their claims rested not on the outcome of the initial trial of the Colorado AG action, but on Cobb's "actionable misconduct" committed when he abandoned their defense prior to the trial.

We disagree with defendants that either of these statements amounts to a judicial admission. They do not purport to prove any facts; to the contrary, they merely identify which of Cobb's actions form the basis for plaintiffs' allegations. Moreover, that plaintiffs do not contend Cobb would have procured a favorable result in the Colorado AG action does not preclude them from claiming that, had Cobb represented them throughout the case, the adverse result would have been less damaging. *See McLister v. Epstein & Lawrence, P.C.*, 934 P.2d 844, 847 (Colo.App. 1996); John W. Grund et al., 7 Colo. Prac.: Personal Injury Practice—Torts and Insurance, *Attorney Malpractice—Theories* § 22.9 (2d ed. 2009) (client may claim damages resulting from adverse result, but may not base breach of contract claim on attorney's failure to achieve a particular result).

We also reject defendants' contention that the arbitration award, which was "in full settlement of all claims submitted to this arbitration," disposed of plaintiffs' consequential damages claim. Plaintiffs' claim for consequential damages was never before the arbitrator, and thus the award could not have settled that issue.

### B. Plaintiffs' claim for consequential damages is permissible.

■ Generally, in a breach of contract action, "both general and special [or consequential] damages may be recovered so long as the two measurements do not duplicate elements of the recovery and so long as the [consequential] damages do not run aground on the limitations imposed on them." Dan B. Dobbs, *Law of Remedies* § 12.2(3) (2d ed. 1993). Here, neither party claims that plain-

tiffs' general and (prospective) consequential damages are duplicative and, based on the following reasons, we conclude that plaintiffs can seek recovery for consequential damages for breach of contract without any limitation arising from the time-barred negligence claims.

■ Unlike a legal malpractice claim founded in negligence, which arises when an attorney breaches the duty of care imposed by the attorney-client relationship, *see* Ray Ryden Anderson & Walter W. Steele, Jr., *Fiduciary Duty, Tort and Contract: A Primer on the Legal Malpractice Puzzle*, 47 S.M.U. L.Rev. 235, 235 (1994), a contract claim arises when an attorney breaches a duty to his or her client to perform a mutually agreed upon contractual obligation, *see Martinez v. Badis*, 842 P.2d 245, 251 (Colo. 1992). This contractual duty is distinct from the duty of care that "forms the essence of negligence claims." *Id.* at 252; *see also Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1262 (Colo.2000) ("The essential difference between a tort obligation and a contract obligation is the source of the duties of the parties.").

■ Thus, whereas a claim based on breach of a duty imposed by the attorney-client *relationship* sounds in tort, "a claim for breach of the attorney-client *contract* is cognizable, [but] it must be based on a specific term in the contract." *McLister*, 934 P.2d at 847 (emphasis added). In *McLister*, for example, a division of this court declined to recognize a distinct breach of contract claim when a plaintiff alleged that his attorney breached a provision requiring him to represent his client "faithfully and with due diligence." *Id.* Rather, the division held, that provision was merely a "restatement of the duties of care and loyalty that attorneys owe to their clients," and thus concluded that the contract claim was "subsumed into [the] plaintiff's malpractice claim." *Id.; see also Torrez v. Edwards*, 107 P.3d 1110, 1113 (Colo.App.2004) (division held claim that attorney breached agreement to provide "professional and competent legal services" was premised upon legal malpractice). *Compare International Tele–Marine Corp. v. Malone & Assocs., Inc.*, 845 F.Supp. 1427, 1435

(D.Colo.1994) (where plaintiff failed to specify which legal services the attorney failed to perform adequately, breach of contract claim held merely alternative to malpractice claim), with *Santulli v. Englert, Reilly & McHugh, P.C.*, 78 N.Y.2d 700, 579 N.Y.S.2d 324, 586 N.E.2d 1014, 1017 (1992) (recognizing distinct breach of contract claim where plaintiff alleged attorney breached provision requiring him to prepare mortgage for plaintiff's business).

Here, the complaint alleged that defendants had failed to comply with the representation agreement's provision that Cobb would "have primary responsibility" for General Steel's defense. Thus, unlike the negligence claims dismissed as time-barred, which were based on defendants' duties arising from their relationship with plaintiffs, plaintiffs' breach of contract allegation was founded specifically on a term of the agreement for which the parties had bargained: a claim separate and distinct from their claims sounding in negligence.

■ Furthermore, a claimant, such as here, who has distinct contract and tort claims may seek relief on one claim even where the other has failed. *See Metropolitan Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 318 (Colo.1980) (where contract obligation had expired, plaintiffs permitted to pursue tort claims based on violation of common law duty to perform work with reasonable care and skill); *Lembke Plumbing & Heating v. Hayutin*, 148 Colo. 334, 337, 366 P.2d 673, 675 (1961) (where contract claim not cognizable, plaintiff permitted to pursue distinct negligence claims); *Fitzgerald v. Congleton*, 155 Vt. 283, 583 A.2d 595, 599–602 (1990) (recognizing that "[a] single complaint may contain multiple causes of action, some of which are time-barred and some not" and permitting plaintiff to claim economic damages under breach of contract where claims for personal damages were barred by negligence statute of limitations); *Hale v. Groce*, 304 Or. 281, 744 P.2d 1289, 1293 (1987) (recognizing distinct contract claim where plaintiff alleged "not that [attorney] performed [his promise to prepare a trust document] negligently, but that he did not perform it at all").

■ We note, further, that although the trial court ordered plaintiffs to submit their breach of contract claim to arbitration, but dismissed their negligence claims, the court seemed to perceive plaintiffs' prospective consequential damages on their contract claim to be identical to those sought under their time-barred negligence claims. However, they are not. While tort damages are based on what is foreseeable to the tortfeasor at the time he commits the tort, contract damages are "based upon the expectations of the party at the time the contract is formed." *Giampapa v. American Family Mut. Ins. Co.*, 64 P.3d 230, 251 (Colo.2003) (Bender, J., specially concurring). Thus, whereas tort damages generally may be imposed for any foreseeable harm, contract damages are limited to damages arising from risks that the parties considered and bargained for. *Id.* at 250–51; *accord* Dobbs, § 12.4(1) ("[C]onsequential damages may or may not be recoverable, depending on whether the risks of those ... damages were part of the basis of the parties' bargain.").

Thus, because, under the circumstances here, we conclude that plaintiffs' contract claim was separate and distinct from their negligence claims, we further conclude that the trial court erroneously prohibited plaintiffs from seeking recovery of their consequential damages for breach of contract.

By this disposition, we render no opinion on whether plaintiffs should recover a certain amount of consequential damages, or any at all. However, because it will arise on remand, we note that although plaintiffs have requested either the arbitrator or the district court to hear their claim for consequential damages, they have not stated a preference. Defendants did not address the issue. Therefore, we determine it more appropriate, as an initial matter on remand, for the trial court to resolve the question of the proper forum to hear that portion of the case.

The portion of the judgment dismissing plaintiffs' CCPA claim is affirmed. The portion of the judgment limiting plaintiffs' recovery for breach of contract is reversed, and the case is remanded to the trial court to determine the proper forum, and then to

hear or refer to arbitration plaintiffs' demand for consequential damages on their breach of contract claim.

Judge NEY * and Judge NIETO * concur.