The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 17, 2018

## 2018COA69

## No. 16CA1983, State of Colorado v. Robert J. Hopp and Associates, LLC — Consumers — Colorado Consumer Protection Act — Colorado Fair Debt Collection Practices Act

A division of the court of appeals considers whether the Colorado Consumer Protection Act (CCPA) and the Colorado Fair Debt Collection Practices Act (CFDCPA) prohibit foreclosure attorneys and title companies from billing mortgage servicer clients foreclosure commitment charges when those full costs were not actually incurred, despite knowing that these fraudulent costs would be assessed against homeowners in foreclosure. The division concludes that such a practice violates the CCPA and CFDCPA.

Court of Appeals No. 16CA1983
City and County of Denver District Court No. 14CV34780
Honorable Shelley I. Gilman, Judge

State of Colorado, ex rel. Cynthia H. Coffman, Attorney General for the State of Colorado; and Julie Ann Meade, Administrator, Uniform Consumer Credit Code,

Plaintiffs-Appellees and Cross-Appellants,

v.

Robert J. Hopp & Associates, LLC; The Hopp Law Firm, LLC; National Title, LLC, d/b/a Horizon National Title insurance, LLC; First National Title Residential, LLC; Safehaus Holdings Group, LLC; and Robert J. Hopp,

Defendants-Appellants and Cross-Appellees,

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE ROTHENBERG*
Taubman and Harris, JJ., concur

Announced May 17, 2018

Cynthia H. Coffman, Attorney General, Jennifer H. Hunt, First Assistant Attorney General, Erik R. Neusch, Senior Assistant Attorney General, Rebecca M. Taylor, Mark L. Boehmer, Assistant Attorneys General, Denver, Colorado, for Plaintiffs-Appellees and Cross-Appellants

Richards Carrington, LLC, Christopher P. Carrington, Ruth M. Moore, Denver, Colorado, for Defendants-Appellants and Cross-Appellees

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2017.

¶ 1    In a case of first impression in the Colorado courts, we address whether the Colorado Consumer Protection Act (CCPA) and the Colorado Fair Debt Collection Practices Act (CFDCPA) prohibit foreclosure attorneys and title companies from billing mortgage servicer clients foreclosure commitment charges when those full costs were not actually incurred, despite knowing that these fraudulent costs would be assessed against homeowners in foreclosure.  We conclude that such a practice violates the CCPA and CFDCPA.

¶ 2    Plaintiffs, the State of Colorado, ex rel. Cynthia H. Coffman, Attorney General for the State of Colorado; and Julie Ann Meade, Administrator, Uniform Consumer Credit Code, brought a civil law enforcement action against defendants, foreclosure lawyer Robert J. Hopp; his law firms, Robert J. Hopp & Associates, LLC, and The Hopp Law Firm, LLC (collectively, the law firms); as well as Hopp's affiliated title companies, National Title, LLC, d/b/a Horizon National Title Insurance, LLC, and First National Title Residential, LLC; and Safehaus Holdings Group, LLC, a company owned by Hopp and his wife Lori L. Hopp, which, through its subsidiary, provided accounting and bookkeeping services for the law firms and

title companies.  The State alleged that Hopp, the law firms, and their affiliated companies violated the CCPA and the CFDCPA by engaging in the billing practice described above.  The district court agreed, for the most part, with the State and imposed penalties totaling $624,000.  While Hopp's wife, Lori Hopp, was a defendant in the district court action, she was not found liable for any claims and is not named as a party to this appeal.

¶ 3  Defendants appeal the trial court's judgment; plaintiffs cross-appeal an evidentiary ruling.

¶ 4  We affirm the district court's judgment and remand the case with directions.

## I.  Background

¶ 5  The trial court, in a thorough written order, found the following facts and described the mechanics of the foreclosure process in Colorado.  The parties do not dispute these facts or description.

## A.  Foreclosure Process

¶ 6  Generally, in Colorado, a person who borrows money from a lender to purchase real property signs a promissory note and an accompanying deed of trust.  A deed of trust is "a security

instrument containing a grant to a public trustee together with a power of sale." § 38-38-100.3(7), C.R.S. 2017. In the deed of trust, the borrower agrees that, upon default, the lender can initiate a nonjudicial foreclosure proceeding, which can result in the public trustee's eventual sale of the property.

¶ 7 A foreclosure may be withdrawn prior to sale for various reasons, such as the borrower's agreement to a loan modification, disposal of the property through a short sale, the lender's agreement to a deed-in-lieu of foreclosure, or the borrower's cure of the default. The public trustee for El Paso County testified that between 2008 and 2016, approximately half of the foreclosures filed in Colorado were withdrawn before sale.

## B. Cure Process

¶ 8 If a borrower wishes to end the foreclosure proceedings by curing the default on the property, he or she may file a written notice of intent to cure with the public trustee. § 38-38-104(1), C.R.S. 2017. The public trustee must promptly contact the lender's attorney to request a written "cure statement" itemizing all sums necessary to cure the default, including missed payments, accrued interest, late fees, penalties, and the fees and costs associated with

the foreclosure. § 38-38-104(2)(a)(I). The lender's attorney may include good faith estimates with respect to interest, fees, and costs. § 38-38-104(5).

## C.    Bid Process

¶ 9    If a foreclosure action is not withdrawn, the property that serves as collateral for the borrower's loan proceeds to sale. Before the scheduled sale date, the holder of the evidence of debt, or the holder's attorney, submits a bid to the public trustee. § 38-38-106(2), (6), C.R.S. 2017. The holder's bid sets the minimum price for bidding on the property and that bid must be at least the lender's good faith estimate of the fair market value of the property, less certain sums identified in section 38-38-106(6). The bid includes the attorney fees and costs.

¶ 10    If the property is purchased at sale for less than the borrower's total indebtedness to the lender, the lender may pursue the collection of the deficiency from the borrower through other avenues. If the property is purchased for more than the total amount of indebtedness to the lender, any overbid may be claimed by others with interests in the property, and then, upon payment of those claims, by the borrower.

### D. Title Commitments In Foreclosure Actions

¶ 11     At the beginning of a nonjudicial foreclosure action, the lender's attorney orders a title product for the subject property. A foreclosure commitment is a title insurance product used to ensure that insurable and marketable title is delivered to the lender at the end of a foreclosure. It is a commitment to issue a title insurance policy upon the satisfaction of certain conditions. A foreclosure commitment often contains a hold-open provision so it does not expire until twenty-four months after it is issued, in contrast to non-foreclosure title commitments, which usually expire six months after issuance.

¶ 12     The title agent's underwriter sets the cost of title products such as a foreclosure commitment. The underwriter sets forth costs in the title company's rate manual and submits the manual to the Division of Insurance (DOI) for approval. The DOI reviews the rates as part of its regulation of the insurance industry. *See* § 10-4-401, C.R.S. 2017. A title agent is bound by the rate filed with the DOI and may not charge more or less than that rate. Div. of Ins. Reg. 8-1-1, § 6(F)-(G), 3 Code Colo. Regs. 702-8.

¶ 13    In the event that a foreclosure action is not completed because the homeowner cures the deficiency by paying the asserted amount due in the foreclosure action, or the foreclosure action is otherwise cancelled or withdrawn, the foreclosure sale does not occur and the title company cannot issue a title insurance policy.

## E.    The Defendants

¶ 14    Hopp is an attorney.  His law firms provided legal services for mortgage defaults, including residential foreclosures, in Colorado.

¶ 15    Through the law firms, Hopp represented loan servicers, such as the Colorado Housing and Finance Authority, JPMorgan Chase, and Bank of America in foreclosure proceedings.  The servicers-clients are not parties to this action.

¶ 16    Hopp owned several businesses which supported the law firms' foreclosure services.  Together with his wife, Hopp owned a holding group, SafeHaus Holdings Group, LLC (SafeHaus). Safehaus owned a subsidiary which performed accounting and bookkeeping services for the law firms.  Safehaus also owned a title company, National Title, LLC, which provided foreclosure commitments for the law firms.  Hopp was a partial owner of another title company, First National Title Residential, LLC, which

also provided foreclosure commitments to the law firms in 2008 and 2009.

¶ 17    National Title and First National Title Residential were authorized to issue title commitments and policies through an underwriter, Fidelity National Title Insurance Company (Fidelity). Fidelity's manual set forth, in relevant part, the following rates and charges for a foreclosure commitment:

I-16 Foreclosure Commitment:

> This section applies to a title commitment issued to facilitate the foreclosure of a deed of trust, including a policy to be issuable, within a 24-month period after the commitment date, naming as proposed insured the grantee of a Confirmation Deed following the foreclosure, the holder of a certificate of redemption or the grantee upon the consummation of a resale between the holder of a Confirmation Deed and a bona fide third party purchaser within the 24-month hold open period. . . .

> The charge will be 110% of the applicable Schedule of Basic Rates based on the unpaid balance of the deed of trust being foreclosed.

> In the event of a cancellation prior to the public trustee's sale there shall be a charge of $300.00 to $750.00, based on the amount of work performed. Cancellations following the public trustee's sale shall be subject to the full charges set forth in the second paragraph.

¶ 18    While representing the servicers, the law firms typically

ordered foreclosure commitments from Hopp's title companies.

National Title invoiced the law firms a charge of 110% of the

schedule of basic rates upon the delivery of a foreclosure

commitment.  As a routine practice, within ten days of filing a

foreclosure action, the law firms passed this cost on to the servicers

by billing and seeking reimbursement from them for the charge of

110% of the schedule of basic rates.  This is the same amount that

Fidelity's manual listed as the charge for a *completed* title insurance

policy, even though a policy had not yet been issued, and in many

cases, never would be issued if a foreclosure was cured or

cancelled.

F.    Procedural History

¶ 19    After a lengthy investigation into defendants' billing practices,

plaintiffs filed a civil enforcement action.  Their 2014 complaint

cites to the former location of the CFDCPA, sections 12-14-101 to -

137, C.R.S. 2014.  The CFDCPA was repealed and replaced in 2017

by sections 5-16-101 to -135, C.R.S. 2017.  In this opinion, we cite

throughout to the current version of the CFDCPA which, as relevant

here, is not materially different.

¶ 20     The plaintiffs asserted the following claims:

- All defendants violated section 6-1-105(1)(l), C.R.S. 2017, of the CCPA by making false or misleading statements concerning the price of services claimed for title search costs, title commitments, and court filing costs.

- The law firms and Hopp violated section 5-16-107(1)(b)(I), C.R.S. 2017, of the CFDCPA by using false, deceptive, or misleading representations in connection with the collection of foreclosure-related debt.

- The law firms and Hopp violated section 5-16-108(1)(a), C.R.S. 2017, of the CFDCPA by collecting amounts that were not expressly authorized by the agreements borrowers had signed creating their debt, or permitted by law, and using unfair and unconscionable means to collect that debt.

Plaintiffs sought a judgment against defendants for declaratory relief, injunctive relief, disgorgement of unjustly obtained proceeds, civil penalties, and attorney fees and costs. Defendants moved to dismiss the action as untimely.

¶ 21    The district court issued numerous, detailed written orders in

this case.  It denied defendants' motion to dismiss for untimeliness

prior to trial.  The court again addressed and rejected defendants'

arguments that plaintiffs' claims were barred by the statute of

limitations set forth in the CFDCPA in its detailed written judgment.

¶ 22    The district court concluded that defendants, with the

exception of Lori Hopp, violated the CCPA in their invoicing for

foreclosure commitments ordered from the affiliated title

companies.  It ruled that the law firms knowingly made "false and

misleading statements of fact concerning the price of foreclosure

commitments by charging for and collecting policy premium

amounts shortly after the initiation of the foreclosure proceeding

and by representing that these costs were actually incurred."  In

doing so, the court credited the testimony that emphasized that a

title premium charge was not earned unless a policy was issued.

¶ 23    The trial court further concluded that Hopp and the law firms

violated the CFDCPA by using "false, deceptive, and misleading

representations in connection with the collection of homeowners'

debt because they falsely represented the 110% policy premium

amount as an actual, necessary, reasonable, and actually incurred

cost, when that amount was not actually incurred by the Hopp law firms." Hopp directed the law firms to invoice these amounts to servicers, knowing they would be ultimately charged to homeowners.

¶ 24 However, the district court concluded that the State failed to prove its CCPA claim alleging Hopp and the law firms engaged in deceptive trade practices when they collected a full title policy premium from servicers, but paid nothing — neither a policy premium nor a cancellation fee — when it ordered title commitments through a nonaffiliated title agency.

¶ 25 The district court declined to exercise its discretion to order disgorgement, based on its finding that the State failed to present trustworthy and reliable evidence that its calculations reasonably approximated the amount of defendants' unjustly obtained gains.

¶ 26 The court entered a permanent injunction prohibiting Hopp, his law firms, or any other persons or entities acting under their control, or in concert with them, from engaging in any of the conduct that was the subject of the case, "including claiming against homeowners in foreclosure a policy premium for a foreclosure commitment before that cost is actually incurred." The

district court imposed penalties on defendants under the CCPA, which were capped by statute at $500,000. It further imposed penalties on Hopp and the law firms in the amount of $1,374,600 under the CFDCPA. Upon consideration of defendants' motion to amend its judgment pursuant to C.R.C.P. 59, the district court reduced the penalties imposed under the CFDCPA to a total of $124,200. Because the statutory amendment allowing penalties was not effective until July 1, 2011, the district court recalculated the total penalty amount to include only transactions occurring after the effective date. Ch. 121, sec. 5, § 12-14-135, 2011 Colo. Sess. Laws 382; sec. 7, 2011 Colo. Sess. Laws at 382. The district court further awarded the State its reasonable costs and attorney fees incurred in enforcing the CCPA and CFDCPA. Defendants appeal the district court's award of plaintiffs' attorney fees and costs in a separate case, *State v. Hopp*, 2018 COA 71, also announced today.

## II.    Statute of Limitations for Penalties

¶ 27    Defendants contend the trial court erred by imposing penalties under the CCPA and the CFDCPA because they were barred by the one-year limitation period set forth in section 13-80-103(1)(d),

12

C.R.S. 2017, as well as section 5-16-113(5), C.R.S. 2017 (CFDCPA claims), and section 6-1-115, C.R.S. 2017 (CCPA claims). We disagree.

### A. Standard of Review and Statute of Limitations

¶ 28 "When a claim accrues under a statute of limitations is an issue of law. We review de novo a trial court's application of the statute of limitations where the facts relevant to the date on which the statute of limitations accrues are undisputed." *Kovac v. Farmers Ins. Exch.*, 2017 COA 7M, ¶ 13 (citation omitted).

### B. Background

¶ 29 Defendants moved to dismiss plaintiffs' claims against them, arguing they were time barred under section 5-16-113(5). Section 5-16-113(5) is contained in a section of the CFDCPA which establishes a private cause of action and is titled "Civil Liability." It requires that any action be brought within one year of the date of the violation. A separate section of the CFDCPA provides for government enforcement actions. § 5-16-127, C.R.S. 2017.

¶ 30 The trial court relied on analogous federal authority applying the federal Fair Debt Collection Practices Act, which limited the application of the comparable statute of limitations provision set

13

forth within its private action section to private causes of action only, not to government enforcement actions. It then reasoned that, because the administrator charged with enforcement of the CFDCPA is the administrator of the Uniform Consumer Credit Code (UCCC), the power of the administrator arises from the UCCC, and the statute of limitations set forth in the CFDCPA does not apply to governmental enforcement actions. The trial court rejected defendants' alternate arguments that the one-year statute of limitations from the catchall section 13-80-103(1)(d) should apply, because it was more general than any specific limitation provisions contained within the UCCC, which it concluded controlled here. Accordingly, the court denied defendants' motion to dismiss the action as untimely, but did not articulate what it concluded the applicable statute of limitations for the CCPA and CFDCPA claims would be.

¶ 31    On appeal, defendants contend the one-year limitation period set forth within the general catchall section 13-80-103(1)(d) should be applied, because, regardless of the theory on which the suit is brought, it states it includes "[a]ll actions for any penalty or forfeiture of any penal statutes." Defendants argue that plaintiffs'

14

CCPA and CFDCPA claims are barred under a one-year statute of limitations because the underlying conduct for the action occurred more than one year before the action was filed. While we agree with the trial court's conclusion that plaintiffs' CCPA and CFDCPA claims were not barred by the statute of limitations, we do so on different grounds, and do not apply the UCCC.

¶ 32 The CCPA contains a specific three-year statute of limitations. § 6-1-115. As relevant here, it allows the three-year period to accrue on the "date on which the last in a series of such acts or practices occurred . . . ." *Id.* "In the absence of a clear expression of legislative intent to the contrary, a statute of limitations specifically addressing a particular class of cases will control over a more general or catch-all statute of limitations." *Mortg. Invs. Corp. v. Battle Mountain Corp.*, 70 P.3d 1176, 1185 (Colo. 2003).

¶ 33 Because the CCPA contains a statute of limitations specifically addressing cases brought under its provisions, the three-year statute of limitations controls over the more general section 13-80-103(1)(d). *See Jenkins v. Haymore*, 208 P.3d 265, 268 (Colo. App. 2007) ("When choosing between statutes that govern limitation periods, courts employ three rules: (1) the more specific statute

applies; (2) a later enacted statute controls over an earlier enacted statute; and (3) courts should select the statute that provides the longer limitation period."), *aff'd on other grounds sub nom. Jenkins v. Panama Canal Ry. Co.*, 208 P.3d 238 (Colo. 2009). As the series of acts underlying the CCPA claim extended into 2013, plaintiffs' claims filed on December 19, 2014, were timely filed within the three-year period.

## C. CFDCPA

¶ 34 In 2017, the legislature passed a law creating a two-year limitations period for administrator actions from the date on which a violation allegedly occurred. S.B. 17-215, 71st Gen. Assemb., 1st Reg. Sess. (May 1, 2017). However, during the years in question for this case, the CFDCPA did not include a clear statute of limitations for government enforcement actions brought under the CFDCPA.

¶ 35 Defendants argue that the court should have applied the statute of limitations for private actions appearing in section 5-16-113(5), which provides for a one-year limitations period "from the date on which the violation occurs." However, for several reasons, we are not persuaded that the legislature clearly intended this period to apply to government enforcement actions.

¶ 36     When the former version of section 5-6-113 (previously section 12-14-113(4), C.R.S. 2014) was enacted in 1985, statutes of limitation generally did not apply to actions brought by the government under the doctrine of *nullum tempus occurrit regi*, the English common law rule that "time does not run against the king" absent an express statement by the legislature otherwise.  *See Shootman v. Dep't of Transp.*, 926 P.2d 1200, 1202-03 (Colo. 1996). It was not until 1996 that the supreme court, in *Shootman*, concluded that the doctrine of *nullum tempus* no longer applied in Colorado.  *Id.*  When the one-year statute of limitations was enacted, it was located in a section of the statute addressing actions brought by private parties.  Ch. 218, sec. 7, § 12-14-113, 2000 Colo. Sess. Laws 938.  It included no express language indicating it was also intended to apply to government actions.  *Id.*

¶ 37     "The statute of limitation in effect when a cause of action accrues governs the time within which a civil action must be commenced."  *Samples-Ehrlich v. Simon*, 876 P.2d 108, 111 (Colo. App. 1994).  Because the CFDCPA did not contain a clear statute of limitations applying to government enforcement actions at the times relevant to this action, a catch-all provision applies.  *Mortg. Invs.*

17

*Corp.*, 70 P.3d at 1185. Section 13-80-102(1)(i), C.R.S. 2017, sets forth a two-year statute of limitations for "[a]ll other actions of every kind for which no other period of limitations is provided," while section 13-80-103(1)(d) lists a one-year statute of limitations for all actions "for any penalty or forfeiture of any penal statutes." For actions falling under either statute, a discovery rule applies. Section 13-80-108(3), C.R.S. 2017, provides that "[a] cause of action for fraud, misrepresentation, concealment, or deceit shall be considered to accrue on the date such fraud, misrepresentation, concealment, or deceit is discovered or should have been discovered by the exercise of reasonable diligence."

¶ 38    The trial court found that "plaintiffs did [not] and could not have discovered the conduct at issue until January 2014, at the earliest." In January 2014, plaintiffs received, for the first time, information provided by the law firms and National Title in response to investigative subpoenas regarding the types of title products defendants provided during foreclosure proceedings. Plaintiffs did not request or receive any information from First National Title Residential before filing their complaint in December 2014. Importantly, the trial court also found that defendants presented no

18

evidence to dispute this date of discovery. Thus, plaintiffs' action, filed in December 2014, was filed within one year of plaintiffs' discovery of defendants' acts underlying the CFDCPA claims.

¶ 39 Because plaintiffs' action was timely filed under either the one-year statute of limitations set forth in section 13-80-103, or the two-year statute of limitations within section 13-80-102, we need not decide which catchall provision should have been applied to plaintiffs' CFDCPA claims. We conclude the trial court did not err in concluding that the CFDCPA claims were timely filed, albeit on different grounds.

### III. Foreclosure Commitment Charges

¶ 40 Defendants contend the trial court erred when it concluded that they violated the CCPA and the CFDCPA by charging 110% of the schedule of basic rates for foreclosure commitment required by Fidelity's rates on file with the DOI. Specifically, defendants argue that the filed rate doctrine precludes a finding of liability for charging amounts which they contend were in compliance with Fidelity's filed rates. The filed rate doctrine limits judicial review of rates approved by regulatory agencies. *Maxwell v. United Servs. Auto. Ass'n,* 2014 COA 2, ¶ 62.

¶ 41    Plaintiffs argue that the trial court correctly concluded that the filed rate doctrine does not apply.  Plaintiffs contend that defendants did not charge amounts in compliance with Fidelity's filed rates for a foreclosure commitment because it required payment from the servicers for the amount chargeable for a title commitment resulting in the issuance of a title insurance policy, even when a title insurance policy was never issued.  We agree with plaintiffs and the trial court.

## A.    Standard of Review

¶ 42    We review the district court's determination of questions of law under C.R.C.P. 56(h), including the application of the filed rate doctrine, de novo.  *Maxwell*, ¶ 61.

¶ 43    We also review the interpretation of an agency's rules and regulations de novo.  *See City & Cty. of Denver v. Gutierrez*, 2016 COA 77, ¶ 11.  "We construe an administrative regulation or rule using rules of statutory interpretation.  We read the provisions of a regulation together, interpreting the regulation as a whole." *Schlapp ex rel. Schlapp v. Colo. Dep't of Health Care Policy & Fin.*, 2012 COA 105, ¶ 9.  We look first to the regulation's plain language and, if it is unambiguous, we need not apply other canons of

20

construction. *Rags Over the Ark. River, Inc. v. Colo. Parks & Wildlife Bd.*, 2015 COA 11M, ¶ 28.

¶ 44    We review the court's findings of fact for clear error, and do not disturb them unless they are unsupported by the record. *Jehly v. Brown*, 2014 COA 39, ¶ 8.

### B.    Law

¶ 45    A party in a civil action may move for determination of a question of law at any time after the last required pleading, and "[i]f there is no genuine issue of any material fact necessary for the determination of the question of law, the court may enter an order deciding the question." C.R.C.P. 56(h). This allows the court to address an issue of law which has a significant impact on how litigation of a case will proceed, but which is not dispositive of a claim and does not warrant summary judgment. *In re Bd. of Cty. Comm'rs*, 891 P.2d 952, 963 n.14 (Colo. 1995).

¶ 46    "[The filed rate doctrine] precludes a challenge to a regulated entity's rates filed with any governmental agency — state or federal — having regulatory authority over the entity." *Maxwell*, ¶ 63. There are two rationales for the doctrine: first, to prevent insurers from discriminating in its charges amongst ratepayers, and, second,

to recognize the exclusive role of agencies in rate approval by deferring to their authority and expertise.  *Id.* at ¶¶ 64-65.

### C.    Analysis

¶ 47     Before trial, defendants filed a motion for a determination as a matter of law, seeking a ruling that their actions in charging the servicers 110% of the basic rate for foreclosure commitments and including that same charge in bid and cure statements complied with Colorado law.  The trial court reframed the question for proper consideration under C.R.C.P. 56(h) as "[w]hat are the appropriate rates and charges for a foreclosure commitment under Section I-16 of Fidelity's Title Insurance Rates and Charges for the State of Colorado?"

¶ 48     After reviewing Fidelity's manual, the trial court ruled as follows:

> A title commitment represents the title insurance company's agreement to insure the property against all liens and encumbrances upon, defects in, and unmarketability of the title to the real property.  Fidelity's Manual provides that 'a commitment will be issued only as an incident to the issuance of a title policy for which a charge is made.'  A title policy does not issue if a foreclosure sale is not held.  Thus, a basic requirement for the

> issuance of a policy is the completion of a
> foreclosure sale.

It concluded that the charge of 110% of the schedule of basic rates applied only to a title commitment *which resulted in the ultimate issuance of a title insurance policy.* Otherwise, the language of section I-16 limited the chargeable amount for a foreclosure commitment that did not result in the issuance of a title insurance policy to a cancellation fee of $300 to $750, based upon the amount of work performed. The trial court drew further support for its conclusion from section A-6.1 of the manual, which stated, "a commitment will be issued *only as an incident to the issuance of a title policy* for which a charge is made." (Emphasis added.) The trial court interpreted this language as confirmation that a commitment is not a "stand-alone title product."

¶ 49    Defendants argue that the trial court erred in its interpretation of Fidelity's manual. They cite to the DOI regulations in effect during the years at issue, which provided that it was a per se unlawful inducement proscribed by section 10-11-108, C.R.S. 2017, to

> 4. [furnish] a title commitment without charge
> or at a reduced charge, unless, within a

reasonable time after the date of issuance, appropriate title insurance coverage is issued for which the scheduled rates and fees are paid. Any title commitment charge must have a reasonable relation to the cost of production of the commitment and cannot be less than the minimum rate or fee for the type of policy applied for, as set forth in the insurer's current schedule of rates and fees[;]

. . . .

8. [charge] less than the scheduled rate or fee for a specified title or closing and settlement service, or for a policy of title insurance[;]

[or]

9. [waive, or offer] to waive, all or any part of the title entity's established rate or fee for services which are not the subject of rates or fees filed with the Commissioner or are required to be maintained on the entity's schedule of rates or fees.

Div. of Ins. Reg. 3-5-1, § 6(A), 3 Code Colo. Regs. 702-3 (effective Oct. 1, 2007-Jan. 1, 2010); *see also* Div. of Ins. Reg. 8-1-3, § 5(D)(2), (7)-(8), 3 Code Colo. Regs. 702-8.

¶ 50        Construing the regulations according to their plain language, we conclude that the regulations merely prohibit a title company from providing a title commitment for free or for a reduced charge unless title insurance coverage is issued within a reasonable time for which the scheduled rate is charged. This language further

24

supports the trial court's interpretation that a title commitment cannot be sold as a stand-alone product. Either a title commitment can be ordered that results in a title insurance policy, or a title commitment can be canceled. Neither the regulations nor Fidelity's manual provided for a third option, in which a title commitment that did not result in the issuance of a title policy would be sold for 110% of the basic rate schedule, or any other amount.

¶ 51　Defendants misperceive the basis of plaintiffs' claims and the trial court's ruling, which does not implicate the filed rate doctrine.

¶ 52　Plaintiffs did not challenge the reasonableness or propriety of the rates set forth in Fidelity's manual, nor did the trial court conclude that defendants were liable for charging rates for services in compliance with Fidelity's rates filed with the DOI. Rather, the trial court concluded that defendants charged servicers, and, thus, homeowners seeking to cure defaults, rates for a service they did not, in most cases, ultimately provide.

¶ 53　Defendants represented that they actually incurred the full cost of a title insurance premium, at 110% of the basic rates schedule, when they invoiced servicers for that amount and listed that amount on cure statements and collected payments at that

25

rate. However, in most cases they only ordered a title commitment, for which a title insurance policy would never be issued. The trial court further concluded that defendants knew that in most nonjudicial foreclosures, the foreclosure would be withdrawn prior to sale, and therefore a title insurance policy would never be issued.

¶ 54 The trial court's findings were supported by evidence provided by both sides at trial.

¶ 55 Hopp testified that he and his law firms only charged the full amount for a title insurance policy and never a cancellation fee in advance for a foreclosure commitment. He further testified that even when a borrower cured a default, the law firms had no responsibility to refund any amount received for a title insurance policy, even though no policy would ever issue. Absent explicit direction from a servicer to cancel a title commitment, he and his firms did not do so. This was true even when Hopp and the law firms were aware that a foreclosure had been cured or withdrawn, because they were given instructions from the servicer to withdraw the foreclosure filed with the public trustee.

¶ 56 Hopp's interpretation of his role and that of his law firms in the cancellation process was at odds with the other evidence

presented at trial. Plaintiffs' expert on title insurance testified that, while a title agent might invoice the full amount of a title policy upon ordering a title commitment, if the client paid that full amount in advance, the title agent was required to deposit the funds into a trust or escrow account because the funds were unearned premiums until a title policy was issued. While he acknowledged that cancellation of a title commitment was an affirmative act that a client must perform, if the requirements for issuing a title policy had not been met during the twenty-four month hold-open period, the agent was responsible for determining the status of the foreclosure through searching public records or communication with his or her client. If conditions for issuing the policy had not been met, the agent was required to refund the premium, less the cancellation fee to the client.

¶ 57 The vice president for title agency Fidelity National Title Company (a distinct entity from Fidelity, the underwriter) testified that when a foreclosure commitment was ordered, it was the company's practice to charge "a fee up front based on the amount of work that's gone into that product and with the anticipation that it has a high probability of cancelling before it finishes." This

27

amount, in most cases, was $300.  Fidelity National Title Company did not charge 110% of the basic rates schedule in anticipation of issuing a title insurance policy, and only did so if a deed of trust was actually foreclosed and a policy was issued.

¶ 58     We also note that, during oral argument, while defendants' counsel argued that the fee was earned at the inception of a foreclosure case, he also conceded that if a mortgage servicer client had specifically requested the cancellation of the title commitment, the client would have been entitled to a refund of the fee charged minus the applicable cancellation fee.  These contentions are inconsistent.  If the title premium charge was fully earned at the time it was charged, a request for its cancellation would not have entitled the client to a full refund of the charge, minus the contractually established cancellation fee.

¶ 59     Because the evidence presented at trial supported the trial court's finding that defendants misrepresented the premium charges as actually incurred costs when they had only ordered title commitments, the trial court did not err.

## IV.  Knowingly/Bad Faith

¶ 60    Defendants contend the trial court erred when it concluded that they knowingly engaged in a deceptive trade practice.  We disagree.

### A.    Standard of Review

¶ 61    As stated in Part II.A, *supra*, we review the court's findings of fact for clear error, and do not disturb them unless they are unsupported by the record.  *Jehly*, ¶ 8.

### B.    Law

¶ 62    To establish a violation of the CCPA, a plaintiff must show the defendant knowingly engaged in a deceptive trade practice.  *Crowe v. Tull*, 126 P.3d 196, 204 (Colo. 2006).  "[T]he element of intent is a critical distinction between actionable CCPA claims and those sounding merely in negligence or contract.  *Gen. Steel Domestic Sales, LLC v. Hogan & Hartson, LLP*, 230 P.3d 1275, 1282 (Colo. App. 2010).  Misrepresentation caused by negligence or an honest mistake is a defense to a CCPA claim.  *Crowe*, 126 P.3d at 204.

¶ 63    While "knowingly" is not expressly defined within the CCPA, the supreme court has addressed the intent requirement for a CCPA claim.  *See Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining,*

29

*Inc.*, 62 P.3d 142, 147 (Colo. 2003). It defined a misrepresentation as a false or misleading statement made "either with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive [another]." *Id.* (quoting *Parks v. Bucy*, 72 Colo. 414, 418, 211 P. 638, 639 (1922)).

¶ 64    In determining civil penalties for a violation of the CCPA, a court should also consider the good or bad faith of the defendant. *People v. Wunder*, 2016 COA 46, ¶ 49.

### C.    Analysis

¶ 65    Here, the trial court's finding that defendants acted knowingly was supported by the following evidence in the record:

- The law firms levied the 110% charge for a future policy that Hopp acknowledged more than likely would never be issued.

- The law firms obtained reimbursement of full title policy premiums, even though Hopp acknowledged that a policy usually was not issued.

- The law firms and the affiliated title companies worked together to overbill and fail to cancel foreclosure commitments for withdrawn foreclosures.

- The law firms and the title companies never cancelled foreclosure commitments, even when they knew a foreclosure had been withdrawn.

¶ 66    This evidence belies defendants' contention that they acted in good faith reliance on their reasonable interpretation that they were charging in accordance with Fidelity's filed rates.

V.    Duplicative Civil Penalties

¶ 67    Defendants contend the trial court erred in imposing civil penalties under the CCPA and the CFDCPA for the same underlying acts.  The complaint gave defendants sufficient notice that plaintiffs sought penalties under both statutes based upon the same conduct.  Yet, defendants did not raise this argument before the trial court before it entered its order imposing penalties under both statutes, nor did it raise this argument post trial in any manner until it filed its brief on appeal.  We do not consider issues raised for the first time on appeal.  *See Estate of Stevenson v. Hollywood*

*Bar & Cafe, Inc.*, 832 P.2d 718, 721 n.5 (Colo. 1992). Accordingly, we decline to consider defendants' argument.

## VI. Exhibit 103

¶ 68 Defendants argue the trial court abused its discretion when it admitted plaintiffs' Exhibit 103 and relied on it in assessing civil penalties against defendants. We reject this contention.

### A. Standard of Review

¶ 69 We review the trial court's evidentiary rulings for an abuse of discretion. *See, e.g.*, *Sos v. Roaring Fork Transp. Auth.*, 2017 COA 142, ¶ 48. "A district court abuses its discretion where its decision is manifestly arbitrary, unreasonable, or unfair, or contrary to law." *Id.*

### B. Facts

¶ 70 Exhibit 103 is a 1114-page spreadsheet compiling electronic invoicing data submitted by Hopp's law firms through a billing software to the servicers from 2008 until the time of trial. BlackKnight Financial Services, formerly LPS, prepared the spreadsheet. Hopp explained that LPS is a software provider, or "data aggregator" that served as a web-based interface between law firms and servicers for billing and payment. Hopp's wife testified

that she used the LPS system to bill for the law firms. After logging into the system, she entered data such as the servicer or client who was being invoiced, file information for the borrower, and selected the costs being billed using drop-down menus.

¶ 71 The director of software development at BlackKnight testified about the creation of Exhibit 103. He explained that vendors, including the law firms, submitted an invoice into a mainframe application, which sent the data to its invoicing system, LoanSphere, for mortgage servicers to access. He testified that Exhibit 103 was a spreadsheet created from the production data from LoanSphere showing data submitted by the law firms. The spreadsheet showed the name of the vendor, or law firm; the loan numbers for the invoices; the invoice number assigned when the data was entered into the system; the department description; the date the invoice was submitted into LoanSphere; the category and subcategory of the line item on the invoice; the quantity; and the item price tied to the line item. It also had columns showing the paid amount, status of payment, and date that a check was created by the servicer. While certain fields such as the dates the invoices were entered into the system were autopopulated, a law firm's

representative entered the item price and category and subcategory for each item. The trial court admitted the spreadsheet as a business record over defendants' objection. It ruled that the exhibit was alternatively admissible as a summary under CRE 1006. In its judgment, the trial court noted that plaintiffs' investigator used spreadsheets provided by LPS, including Exhibit 103, to determine what the law firms billed servicers for foreclosure commitments in 2291 transactions which did not match a loan number where a policy was ultimately provided.

¶ 72    Addressing Exhibit 103, the court also indicated that "[b]ecause of the lack of verification of the entries in Plaintiffs' Exhibit 103, the Court places little weight on the exhibit." The court clarified in a post-trial order that its concern with the exhibit related to entries in the spreadsheet designating a "check confirmed" status regarding whether an invoice had been paid by a servicer to the law firms. The trial court reiterated that it "comfortably relied on this exhibit in determining 2,291 representations and calculating the penalties."

## C. Business Record Exception to Hearsay

¶ 73    Hearsay is an out-of-court statement made by someone other than the declarant while testifying at trial, which is offered to prove the truth of the matter asserted.  CRE 801(c).  Hearsay is inadmissible unless it falls within a statutory exception or an enumerated exception in CRE 803 or 804.  CRE 802.

¶ 74    CRE 803(6) allows evidence to be admitted under the business record exception to the hearsay rule if the following conditions are met:

> (1) the document must have been made "at or near" the time of the matters recorded in it; (2) the document must have been prepared by, or from information transmitted by, a person "with knowledge" of the matters recorded; (3) the person or persons who prepared the document must have done so as part of a "regularly conducted business activity"; (4) it must have been the "regular practice" of that business activity to make such documents; and (5) the document must have been retained and kept "in the course of" that, or some other, "regularly conducted business activity."

*Schmutz v. Bolles*, 800 P.2d 1307, 1312 (Colo. 1990) (quoting *White Indus. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1059 (W.D. Mo. 1985)).  If the record is a compilation of data, and the original data was prepared in compliance with the above conditions, the fact that

the data was compiled into a spreadsheet or document for litigation does not affect its admissibility. *People v. Ortega*, 2016 COA 148, ¶ 15 ("[I]n the context of electronically-stored data, the business record is the datum itself, not the format in which it is printed out for trial or other purposes." (quoting *United States v. Keck*, 643 F.3d 789, 797 (10th Cir. 2011))); *People v. Flores-Lozano*, 2016 COA 149, ¶ 15; *Florez-Lozano*, ¶ 25 (Bernard, J., specially concurring).

## D.    Analysis

¶ 75    The trial court correctly concluded that the foundational requirements for admitting the spreadsheet as a business record had been met. The BlackKnight representative testified that the entries into the invoicing system were made at the time a representative of the law firms entered it into the mainframe application. Hopp and his wife both confirmed this process in their testimony. The data entered was within the knowledge of the law firms, and kept in the course of their regularly conducted business, which was representing loan servicers in foreclosure cases. It was the law firms' regular practice to create a record of invoiced items through LPS and to retain those records.

¶ 76    Thus, the trial court did not abuse its discretion when it admitted Exhibit 103 as a business record under CRE 803(6). Because we conclude the trial court did not abuse its discretion in admitting the exhibit on that basis, we need not consider whether it would have been properly admitted as a summary under CRE 1006.

## VII.   Exhibit 1093

¶ 77    Plaintiffs contend on cross-appeal that the trial court abused its discretion when it admitted defendants' Exhibit 1093 to rebut plaintiffs' Exhibit 104.  We disagree.

### A.    Background

¶ 78    At times, servicers directed the law firms to order foreclosure commitments from LSI Default Title and Closing, also known as LSI Title Agency, a division of LPS, instead of from one of Hopp's affiliated title companies.  During discovery, defendants produced to plaintiffs an invoicing statement from LSI (Exhibit 104), dated September 4, 2015.  Exhibit 104 showed that, on 1186 foreclosure files, in which Hopp and the law firms collected a full title policy premium from servicers, they paid nothing — neither a policy premium nor a cancellation fee — to LSI for title commitments ordered.  Exhibit 104 reflected that LSI appeared to charge

defendants only $350 for title commitments ordered, which was representative of a cancellation fee.

¶ 79     Plaintiffs amended their complaint to add claims against defendants for violating the CCPA and CFDCPA through its conduct with regard to the LSI transactions. In its written notice of claim filed with the court adding the claim, plaintiffs alleged that the invoices from title commitments ordered from LSI included the eventual price for issuance of a title policy. At trial, plaintiffs argued, consistently with the data in Exhibit 104, that LSI expected to be paid only the cancellation fee amount on files where no title insurance policy was issued, and that Hopp and the law firms had paid LSI nothing.

¶ 80     The controller of accounting for the successor company to LSI testified that Exhibit 104 showed the charges due as of September 4, 2015, the date the exhibit was printed, which incorporated any adjustments made before that date. He testified that at some point in "roughly mid 2015," his team was asked by LSI's internal operations department to amend numerous charges to $350, which appeared to be inconsistent with the invoices provided to the law firms.

¶ 81    Defendants introduced an email from an LSI representative to Hopp's wife, which included an attached spreadsheet similar to Exhibit 104, but dated December 3, 2014.  This December 2014 spreadsheet, Exhibit 1093, showed charges for full policy premiums rather than outstanding charges of $350, which were representative of cancellation fees.  Plaintiffs objected to the admission of Exhibit 1093.  Their counsel argued, "One, I don't think there's a sufficient foundation that [the controller] has knowledge of this document.  Two, we've never seen this before.  This makes two documents in a row that I've received for the first time at the witness table.  It makes it very difficult to review them."  Defendants urged the trial court to admit the exhibit under CRE 613 for impeachment.  The trial court admitted the exhibit without explaining its decision.

¶ 82    After considering both exhibits, and the "unusual and unexplained adjustments on Plaintiffs' Exhibit 104," which were demonstrated through the controller's testimony and discrepancies between Exhibit 104 and Exhibit 1093, the trial court declined to place any weight on Exhibit 104 in its final order, and concluded that plaintiffs had failed to prove their claim based on the LSI transactions.

## B.    Disclosure

¶ 83    Plaintiffs argue that C.R.C.P. 26 required defendants to disclose Exhibit 1093.  We disagree.

¶ 84    C.R.C.P. 26, as it appeared during the years at issue, required parties, as part of their mandatory disclosures, to identify and provide documents "relevant to disputed facts alleged with particularity in the pleadings."  C.R.C.P. 26(a)(1)(B) (2014).  Under the rule then in effect, a party was obligated to supplement its disclosures made if it learned that the information previously disclosed was incomplete or incorrect in some material respect and the additional information had not otherwise been made known to the other parties during discovery.  C.R.C.P. 26(e) (2014).

¶ 85    We review a trial court's ruling on a discovery issue and decision whether to impose any sanction for an abuse of discretion. *See, e.g.*, *Pinkstaff v. Black & Decker (U.S.) Inc.*, 211 P.3d 698, 702 (Colo. 2009).  "A trial court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair."  *Id.*

¶ 86    The LSI claim was not part of plaintiffs' original complaint.  Rather, it was added after disclosure of Exhibit 104 in the discovery process, after discovery had closed and mere weeks before the trial

began. The written notice of claim alleged that LSI expected to be paid a cancellation fee of $350 at the outset of billing for a foreclosure commitment, not full title insurance policy premiums.

¶ 87 Even if we assume that defendants should have identified Exhibit 1093 as a required supplement to its previous disclosures, upon plaintiffs' addition of the LSI claim to their complaint, the decision of what, if any, sanction to impose on defendants for their failure to do so was well within the trial court's discretion. If the trial court decides that a sanction is warranted for a discovery violation, it should "impose the least severe sanction that will ensure there is full compliance with a court's discovery orders and is commensurate with the prejudice caused to the opposing party."

¶ 88 A trial court does not err in declining to impose sanctions for a discovery violation if the failure to disclose was harmless. *Trattler v. Citron*, 182 P.3d 674, 679-80 (Colo. 2008). In evaluating harmlessness,

> the inquiry is not whether the new evidence is potentially harmful to the opposing side's case. Instead, the question is whether the failure to disclose the evidence in a timely fashion will prejudice the opposing party by denying that party an adequate opportunity to defend against the evidence.

41

*Todd v. Bear Valley Vill. Apartments*, 980 P.2d 973, 979 (Colo. 1999).

¶ 89 Here, given the late addition of the LSI claim, and the parameters of the claim set forth in the plaintiffs' written notice, the trial court did not abuse its discretion in declining to exclude Exhibit 1093 as a sanction for defendants' failure to supplement their mandatory disclosures at a late point in litigation. While Exhibit 1093 was arguably related to the claim and the data set forth in Exhibit 104, plaintiffs only argue in a conclusory fashion that failure to disclose Exhibit 1093 constituted a tactic of trial by surprise.

¶ 90 Plaintiffs argue that, with proper disclosure of the exhibit, they could have responded to and explained the evidence with an appropriate witness from LSI. However, the LSI controller testified at trial that his department had received and made changes to numerous charges within the spreadsheet in the middle of 2015. Plaintiffs had the opportunity to cross-examine the controller and did so at trial. Accordingly, the trial court did not abuse its discretion in declining to exclude Exhibit 1093 because defendants did not disclose it prior to trial.

## C. Trial Management Order

¶ 91    Plaintiffs further argue that C.R.C.P. 16(f)(5) precluded the admission of Exhibit 1093 because it was not included in the trial management order and the trial court failed to make necessary findings to support its admission. We disagree for two reasons.

¶ 92    First, plaintiffs failed to preserve this argument in the trial court and "[a]rguments never presented to, considered or ruled upon by a trial court may not be raised for the first time on appeal." *Estate of Stevenson*, 832 P.2d at 721 n.5.

¶ 93    Second, while plaintiffs objected to the admission of Exhibit 1093 on the general basis that it was not disclosed to them before trial, they did not argue that it conflicted with the trial management order. In any event, plaintiffs cite to no authority, and we have found none, that requires the trial court to sua sponte make findings pursuant to C.R.C.P. 16 whenever it permits a deviation from the trial management order. Accordingly, the trial court did not abuse its discretion in failing to sua sponte make findings under C.R.C.P. 16(f)(5) because plaintiffs' objection on this particular ground was not made known to the court.

## D.    Foundation

¶ 94     Plaintiffs argue that Exhibit 1093 lacked a sufficient foundation because the controller did not have personal knowledge necessary to authenticate it.  We disagree.

¶ 95     Authentication is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." CRE 901(a).  One way in which an exhibit may be authenticated is through its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."  CRE 901(b)(4).  A division of this court has held that emails may be authenticated through either testimony explaining that they are what they purport to be or through consideration of their distinctive characteristics shown by an examination of their content and substance.  *See People v. Bernard*, 2013 COA 79, ¶ 10.

¶ 96     Here, the controller testified that a member of the collections team at his company sent the email to Lori Hopp; he recognized the sender's name and email address as it appeared on the email; he recognized the sender's email signature, which included the company's logo; and the attachment to the email was consistent

with collection statements the company sent out. Because the controller could authenticate the email through its distinctive characteristics, he was not required to have personal knowledge of the document itself. Thus, he laid a sufficient foundation for the admission of Exhibit 1093.

### E. Impeachment Versus Rebuttal

¶ 97 To the extent that plaintiffs argue that Exhibit 1093 was improperly considered for its substance, rather than just impeachment, we disagree. While defendants offered Exhibit 1093 under CRE 613, the trial court's ruling did not indicate that it admitted the exhibit on that basis. The terms impeachment and rebuttal are sometimes used interchangeably; impeachment generally refers to proof a witness made statements inconsistent with his or her present testimony. *People v. Trujillo*, 49 P.3d 316, 320 (Colo. 2002). Rebuttal, however, is contrary evidence — "that which is presented to contradict or refute the opposing party's case." *Id.* at 321. Rebuttal evidence is substantive in nature and may support a party's case-in-chief. *Id.* at 320. Here, Exhibit 1093 was admitted to contradict the data presented in Exhibit 104. Accordingly, it was admitted as rebuttal evidence, and the trial

45

court did not abuse its discretion when it considered Exhibit 1093 for its substance, rather than limiting its consideration to impeachment.

## VIII.  Appellate Attorney Fees

¶ 98     Both parties request an award of their attorney fees and costs incurred in this appeal.  We agree that, under section 6-1-113(4), C.R.S. 2017, and section 5-16-133, C.R.S. 2017, plaintiffs are entitled to an award of their reasonable appellate attorney fees.  *See* *Payan v. Nash Finch Co.*, 2012 COA 135M, ¶ 63 (extending CCPA provision awarding attorney fees to party successfully defending trial court's judgment on appeal).  The amount of appellate attorney fees awarded should not include any fees incurred in the pursuit of plaintiffs' cross-appeal, as they were unsuccessful on that issue in the district court and on appeal.  We exercise our discretion under C.A.R. 39.1 to remand this issue to the trial court to determine the total amount of plaintiffs' reasonable fees and costs incurred on appeal, with the limitations specified, and to award those amounts.

¶ 99     Defendants' request for appellate attorney fees is denied.

## IX.  Conclusion

¶ 100     We affirm the district court's judgment and remand the case with directions to determine an award of plaintiffs' reasonable appellate attorney fees, less any fees incurred in the pursuit of plaintiffs' unsuccessful claim on cross-appeal.

JUDGE TAUBMAN and JUDGE HARRIS concur.